**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

ROLAND ELLIOTT,

                             Plaintiff,

      -against-


THE CITY OF NEW YORK, a municipal entity;
NEW YORK CITY HOUSING AUTHORITY;
NEW YORK CITY POLICE DEPARTMENT
OFFICER LT. ERIC S. DYM; NEW YORK CITY
POLICE DEPARTMENT OFFICERS JANE DOE;
and JOHN DOES 1-10, all of whom are sued in their
individual and their official capacities.

Defendants.
-------------------------------------------------------------------- X

**COMPLAINT**
**23-CV-352**

**JURY TRIAL DEMANDED**

## PRELIMINARY STATEMENT

1.     This civil rights action seeks redress for injuries Plaintiff suffered from the

unconstitutional conduct of Defendants THE CITY OF NEW YORK, NYCHA, and New York

City Police Officers Eric S. Dym, JANE DOE, and JOHN DOES 1-10.

2.     On April 7, 2020, Plaintiff ROLAND ELLIOTT was at home in the Mott Haven

Houses, in the Bronx, in New York City.  The Mott Haven Houses are largely Black and Latinx

and heavily and disproportionately patrolled and surveilled by NYPD as a regular practice. That

evening, Mr. Elliott went outside to check on his children. They were part of a vigil outside his

building for a child who had been killed earlier that day.  While at the vigil, Mr. Elliott

questioned why the police were harassing the children gathered to mourn and was confronted by

two uniformed police officers. The police turned their attention to him and, without issuing any

requests or commands relating to a search or a stop, quickly began violent takedown, grabbing

him forcibly, beating, tasing, and kicking him. He was arrested, taken to PSA 7, eventually allowed medical attention, and arraigned the following day.  He was released on his own recognizance and the case was eventually discussed.

3.      This shocking incident took place in the early days of the COVID-19 pandemic in New York City. The selective enforcement of COVID-19 social distancing rules, as well as the generalized stress of navigating the unknown threat of COVID-19 within the everyday unleashed a wave of police harassment and violence in Black and Latinx communities in New York City. Even when known, it was tolerated, licensed, and justified by City officials and leadership. Mr. Elliott and many others in his community suffered from unwarranted attention, multiple violations of their constitutional rights, disproportionate arrests, and selective enforcement in this period.

4.      At the time, and today, it was incumbent upon the NYPD to refrain from racial profiling, selective enforcement, and disproportionately risking the lives of Black and Latinx New Yorkers. NYPD's prior policy and practice that allowed unlawful stops of hundreds of thousands of New York City residents, particularly young Black and Latinx men, had been deemed illegal racial profiling in *Floyd et al. v. The City of New York*, 08-CV-1034 (AT) (S.D.N.Y.), and NYPD remained under judicial oversight. At trial, the City was found to have maintained an unlawful policy and practice of stops, questioning, and frisks in violation of the Fourth and Fourteenth Amendments. *See Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y 2013). Nevertheless, Mr. Elliott was part of a *de facto* policy and practice of selective enforcement, surveillance, violence, and arrests in this period.

5.      Plaintiff Roland Elliott seeks redress for the substantial injuries he suffered when he was unlawfully stopped, beaten, arrested, and detained, and when he was subject to the

unlawful policies and practices of the City that led to these injuries and distress. Mr. Elliott also seeks relief for the ongoing unconstitutional policies and practices that enabled the violation of his rights, ranging from March 1, 2020 – October 30, 2022. Mr. Elliott seeks (i) compensatory damages for psychological and emotional distress, and other financial loss caused by the illegal actions of the Defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief, including injunctive relief, costs and attorney's fees, as this Court deems equitable and just.

## JURISDICTION

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

7.      Supplemental jurisdiction is conferred upon this Court by 28 U.S.C. § 1367(a) over any and all state law claims that are so related to the federal claims that they form part of the same case or controversy.

8.      Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.

## VENUE

9.      Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2), as this is the judicial district in which the events giving rise to Plaintiff's claims took place. In addition, Defendants conduct business and maintain their principal place of business in the counties of Bronx and New York, in the Southern District of New York.

## JURY DEMAND

10.    Plaintiff demands a trial by jury in this action on each and every one of his claims for which a jury trial is legally available.

## PARTIES

11.    Plaintiff ROLAND ELLIOTT is an African-American citizen of the United States and the State of New York in his mid-forties.  At all times relevant to this complaint, Mr. Elliott was a resident of the State of New York, the borough of the Bronx, and Bronx County. He is a father, a family man, a well-known member of the community, and a New York City Housing Authority resident. At all times relevant herein, Mr. Elliott lived in the Mott Haven Houses, a NYCHA property in the South Bronx.  The neighborhood and these houses were overwhelmingly Black and Latinx. *See* NYU Furman Center, *Mott Haven / Melrose Neighborhood Indicators* (2019) available at https://furmancenter.org/neighborhoods/view/mott-haven-melrose (Mott Haven /Melrose neighborhood is 73% Hispanic and 25% Black).

12.    Defendant CITY OF NEW YORK ("the City") is a municipal entity created and authorized under the laws of the State of New York.  It is authorized under the laws of the State of New York to maintain, operate, and govern a police department, the New York City Police Department ("NYPD"), which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The law enforcement activities of the NYPD are supported in part by federal funds.

13.    Defendant NEW YORK CITY HOUSING AUTHORITY ("NYCHA") is a public housing authority in the City that owns and operates housing for low-income residents in all five boroughs of New York City. NYCHA is responsible for the creation and implementation of

policing and security policies in NYCHA Residences. NYCHA's principal offices are located at 250 Broadway, New York, New York 10007. NYCHA is funded in large part by federal funds.

14.     Defendant Police Officers ERIC S. DYM, JANE DOE, and JOHN DOES 1-10 ("Individual Defendants") are NYPD Police Officers who unlawfully stopped, harassed, used unlawful force, and arrested and detained Plaintiff without any reasonably articulable suspicion of illegal activity.

15.     Upon information and belief, the Individual Defendants are still NYPD Police Officers, with the exception of Defendant Dym, who was nevertheless an NYPD member of service throughout the relevant period.

16.     At all times relevant herein, the Individual Defendants have acted under color of state law in the course and scope of their duties and/or functions as agents, employees, and/or officers of the City and/or the NYPD.

17.     At all times relevant herein, the Individual Defendants violated clearly established rights and standards under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, of which a reasonably prudent police officer in their circumstances would have known.

## STATEMENT OF FACTS

18.     The evening of Tuesday, April 7, 2020, in the Mott Haven neighborhood of the Bronx, New York, community members set up a vigil and memorial to mourn a child from the community, Lotti, who had been killed earlier that day. Many children and members of the community were gathering, contributing to the memorial, and mourning throughout the day and evening.

19.     Plaintiff, ROLAND ELLIOTT, and his children knew the child who was killed well. The vigil was staged directly outside of his apartment, in NYCHA housing. His own children and others he knew from the community, including others he had looked out for, were present and a peaceful vigil was underway. Mr. Elliott was home that day and eventually went out to check on the kids, who were outside mourning their friend. Mr. Elliott, arrived at the vigil around approximately 8:00 pm on Tuesday, April 7, 2020.

20.     When Mr. Elliott arrived, two plainclothes police were already at the scene and actively interfering with the vigil, including attempting to disperse the peaceful vigil. Among other things, the police were informing the children they were not allowed to be present at the vigil to commemorate their friend. Mr. Elliott informed the officers the children were mourning their friend. Upon speaking, Mr. Elliott was immediately approached by NYPD officers, one of whom said, "Who the hell are you?" and asked his name, which he gave. Immediately afterward, he was harassed and aggressed. The officers cursed at him, including using obscene language, demanded he remove his hands from his pockets, and verbally harassed him.

21.     Mr. Elliott decided to leave the vigil. As Mr. Elliott was departing, and without issuing any advice that he was under arrest or otherwise being taken into custody, the police approached Mr. Elliott and began punching, hitting, and tackling him to the ground. They

continued hitting, kicking, punching, and physically attacking Mr. Elliott. Additional officers arrived and joined the attack on Mr. Elliott. The police also used a taser device against Mr. Elliott, bringing him to the ground. Even once he was on the ground, the police continued tasing Mr. Elliott, and continued punching and kicking Mr. Elliott. Several officers coordinated their actions to conduct this ongoing attack, involving excessive force and a clear, ongoing violation of Mr. Elliott's rights. This unprovoked, unjustified, and unconscionable physical attack lasted for a considerable period of time without any attempt to deescalate or mitigate the unnecessary and unlawful use of force, a true act of police brutality.

22.     The NYPD officer initiating and perpetuating the stop, harassment, initiation and persistence of the use of force, and the arrest was retired NYPD Lieutenant Eric S. Dym. Eric S. Dym has the distinction of having the highest number of pending complaints against an NYPD officer at the time who recently retired, after a finding that he should face firing as discipline for police misconduct. *See* Yoav Gonen, *Most-Complained-About NYPD Cop Retires, Avoiding Penalties*, The City, available at https://www.thecity.nyc/2022/9/19/23360186/nypd-eric-dym-civilian-complaints-retires. He was subject to significant scrutiny, disciplinary review and trial, and number of complaints, lawsuits, and settlements in his nearly 17-year tenure with the NYPD *See e.g.,* https://www.50-a.org/officer/67142#lawsuits-details. He had been subject to numerous complaints and investigations involving force, abuse, discourtesy, offensive language ("FADO"), and other affirmative misconduct on duty. The City was aware, actually and constructively, of his failures to serve the community yet he was ubiquitous in police action and misconduct throughout the relevant period.

23.     One female officer was with him at the initiation of the harassment and use of force and participated in the misconduct and violation of rights, and several other officers joined

and participated as the violence against Mr. Elliot continued. At no time were de-escalation or use of force tactical plans and reviews employed, as is required in the NYPD Patrol Guide.

24. After the physical attack, the NYPD officers handcuffed Mr. Elliott and took him to PSA 7 by police vehicle, with the taser prongs still in his legs. He was never offered medical attention.  At PSA 7, he was detained in a holding cell, still in handcuffs.  Although he posed no threat to anyone, he was left handcuffed in the jail cell. Eventually, an officer tore the taser prongs from Mr. Elliott's legs, he was searched, his property was taken, and he was shackled at the ankles.  He was held in the precinct like this for approximately an hour. Although he had not fought with the police and was unsure what had prompted their physical attack, he was told by an officer, while detained in the precinct, "Oh, you like fighting with police, that's what you get."

25. Throughout this period, Mr. Elliott was in pain and suffering from the many injuries he experienced from the NYPD officers' unprovoked attack. He was denied medical attention or treatment, despite repeated requests for a significant period of time. Eventually, he was taken to the Lincoln Hospital, where he waited for a considerable period in the waiting room for medical attention. Eventually, he was taken into the back of the hospital, where he was handcuffed to a door by NYPD personnel. He saw the doctor and received medical attention and tests over the next several hours.

26. Eventually, NYPD officers took Mr. Elliott from the hospital and returned to PSA 7, where he was booked into custody and his fingerprints and photos were taken.  He was, eventually, taken to Central Booking where he saw another doctor. Later that day, he was brought to arraignments in Bronx County Criminal Court, where he was arraigned and released on his own recognizance and given a date to return to court. He was finally released around 4 p.m. on Wednesday, April 8, 2020.  He spent several hours going between PSA 7, Central

Booking, and the courthouse to retrieve his seized, property, money, and identification. He was told to return to court on July 30, 2020 and ultimately the case was dismissed.

27.     It was only when Mr. Elliott returned home, nearly twenty-four hours after his arrest, that he saw the lacerations, bruising, swelling, and injuries to his face and head, still covered in blood, that were inflicted by the police. At that time, he learned that his son's mother was also chased by the police the previous night, who also told her they would put his son "in the ground," after remarking that the police were harassing her son. His son was also arrested that night.

28.     On Wednesday night, as Mr. Elliott arrived home, the police attacks in the community continued. Throughout that night as well, uniformed and plainclothes officers went through the Mott Haven Houses, harassing, beating, and arresting young people, including one of Mr. Elliott's sons. Another of his sons was nearly arrested for filming the community interactions with the police.  Mr. Elliott, still shaken by his experience of the police beating and arrest, avoided leaving his apartment for weeks. At times, when he did leave, he often observed officers following and observing him in unmarked vehicles on different occasions. This fed a cycle of anxiety, stress, fear, and emotional distress that greatly impacted him.

29.     Mr. Elliott was one of many Mott Haven Houses residents and people in the vicinity of the Mott Haven Houses harassed, illegally stopped and searched, and experiencing the unlawful use of force in this period. The experiences of Mr. Elliott, and others during this period, were not grounded in any credible claim of individualized, reasonable articulable suspicion, probably cause, or even general inquiry.

**NYPD's Unconstitutional Pattern and Practice During the COVID-19 Pandemic**

30.     Despite ubiquitous narratives that "we are all in this together," many Black New Yorkers experienced the early months of the pandemic as periods of enhanced risk of stop,

arrest, and police use of force and, concurrently, enhanced risk of illness or death, all on the basis of their race. Policies put in place by the City licensed selective enforcement and abusive and racialized policing practices, ignored known and foreseeable risks, violated constitutional rights, and placed Mr. Elliott and others in his community at risk.

31.    Policing policy directly effectuated these violations of constitutional rights. Selective enforcement and the foreseeable consequences of racial profiling involved an added layer of risk, consequence, and harassment to the stress, anxiety, and uncertainty of navigating the COVID-19 pandemic.

> Findings suggest that ZIP codes with higher percentages of lower income and Black residents experienced disproportionately high rates of policing during the COVID-19 pandemic in the name of public health. Moreover, findings lend empirical support to claims made by legal advocates that COVID-19 policing mirrored the racially discriminatory practices of the stop-and-frisk program that were deemed unconstitutional. According to published reports, some COVID-19-related police stops were violent in nature, placing individuals at risk of physical harm….

See Sandhya Kajeepeta, *et al., Policing the pandemic: estimating spatial and racialized inequities in New York City police enforcement of COVID-19 mandates,* 32 Critical Public Health 56, 63-64 (2022) (citations omitted). Recent research affirms that "[p]ronounced spatial and racialized inequities in pandemic policing of public health" mimicked "historical policing practices deemed racially discriminatory." *Id. See also, e.g.,* Harald Schmidt, *The Way We Ration Ventilators is Biased*, The New York Times (April 15, 2020) (structural inequality leads to lower baseline health among particular racial and ethnic groups, resulting in a de-prioritization of those patients for ventilators).

32.    Among other policy decisions ignoring, denying, or justifying the culture of denial of systemic racism, racial inequity and inequality, and racial injustice, and the role of the

government in this, the use of NYPD to enforce COVID-19 social distancing policy created a policy and practice that licensed, and even justified racial discrimination and bias, resulting in a foreseeable violation of rights in addition to heightened risk:

> [G]iven the high rates of coronavirus infection and low rates of mask wearing among NYPD officers, increased police presence in a neighborhood is expected to increase the overall risk of transmission in that area....Research shows that there are collateral consequences of police contact that spill over beyond the individual being stopped, impacting entire neighborhoods: Living in a neighborhood with high rates of police stops is associated with increased psychological distress, anxiety, post-traumatic stress, and asthma episodes among. This research also suggests that these spillover effects can be more pronounced among Black residents than white residents, thereby potentially producing and exacerbating racialized health inequities.

*Id.* at 63-64 (citations omitted).

33.     In New York City, the COVID-19 pandemic effectively began in March of 2020. In March 2020, in response to the COVID-19 outbreak in New York state, then-Governor Cuomo announced, in New York, that non-essential workers would be required to work from home. NYS Department of Health, *New York State on PAUSE*, (March 22, 2020) *available at* https://coronavirus.health.ny.gov/new-york-state-pause  ("effective at 8PM on Sunday, March 22, all non-essential businesses statewide will be closed"). Then-Mayor de Bill de Blasio also declared a social distancing plan, banning group gatherings, congregating in public, etc. for New Yorkers. Yet, there was no publication of guidelines or rules to structure enforcement of social distancing.  Notably, no curfew was ever instituted in New York City. People were asked to remain home (#StayHome), but never prohibited from leaving their homes other than for essential needs, as they were in some European countries. No proof of purpose, or justification of any kind, was mandated for people in public spaces in New York City.

34.      However, from the beginning, the City selectively enforced COVID-19 restrictions, often with a particular punitive, carceral, and force-ridden approach for Black and Brown New Yorkers and in Black communities in the City. The relevant period in this case is from March 1, 2020 until October 30, 2022.  It begins with the start of COVID-19 enforcement in New York City, which both licensed and tolerated an expansive version of police enforcement that selectively,  openly, and recklessly violated the constitutional rights of Black and Latinx New Yorkers and until the retirement of Defendant Dym, a significant driver of the misconduct in Mr. Elliott's community, who consistently leveraged and exploited pretextual opportunities to harass, use force, and violate the rights of the residents of Mott Haven Houses.

**During the Relevant Period, Black and Latinx Communities Navigated the Most Significant Risk and Were Hardest Hit by COVID-19 Infection, Illness, and Fatalities**

35.     Despite shared physical susceptibility to infection, the social determinants of health put Black and Latinx New Yorkers at particular risk of COVID-19. In many respects, the COVID-19 pandemic was defined by racial disparities resulting from policy and practice that declared itself universal or denied its racialized impact. These risks persisted even for those who were not essential workers, drivers, or the like, because of the crowded nature of public housing, public hospitals, and public accommodations in communities that are disproportionately Black in New York City.

36.     Recent research has confirmed a reality that was evident and discussed at the time: policy, practice, and procedure that failed to account for structural inequities and foreseeable social determinants of health, and instead prioritized those most likely to benefit, could perpetuate and exacerbate pre-existing systemic injustices, including systemic racism, racial inequality, and public health risks. *See* Elizabeth Badalov, *et al., COVID-19 double jeopardy: the overwhelming impact of the social determinants of health*, 21 International Journal for Equity in Health 76 (2022). This includes policing policy targeting low-income Black communities.  During the COVID-19 pandemic the foreseeable effects of the social determinants of health were amplified, leaving Black and Latinx people with significantly poorer health prospects and lower prospects of accessing high quality medical care and benefitting from it even when available, resulting in higher mortality rates for minority patients. *Id.*

37.     Even at the time it was clear that Black and Latinx individuals experienced particularly high risk and Black and Latinx communities in New York City have been hardest hit by COVID-19. See NYC Health, *Age adjusted rate due to increased vulnerabilities given a range of fatal lab confirmed COVID-19 cases per 10,000 by race/ethnicity group* (April 6, 2020)

available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-deaths-race-ethnicity-04162020-1.pdf (showing 22.8 deaths per 10,000 Hispanic New Yorkers and 19.8 deaths per 10,000 Black New Yorkers in contrast to 10.2 deaths per 10,000 White New Yorkers).

38.     Disproportionately in Black and Latinx communities, people navigated the uncertainty of COVID-19 in the context of commuting to work daily, more severe infections and higher mortality, more crowded housing (including public housing), and strained public hospitals forced to ration treatment during the pandemic. See NYC Comptroller, *New York City's Frontline Workers* (March 26, 2020) available at https://comptroller.nyc.gov/reports/new-york-citys-frontline-workers/ ("75 percent of all frontline workers are people of color, including 82 percent of cleaning services employees. More than 40 percent of transit employees are black while over 60 percent of cleaning workers are Hispanic."); Michael Schwirtz and Lindsey Rogers Cook, *These N.Y.C. Neighborhoods have the Highest Rates of Virus Deaths,* The New York Times (May 18, 2020) (Neighborhoods with high concentrations of Black and Latino people suffered the highest death rates in New York City); Harald Schmidt, *The Way We Ration Ventilators is Biased*, The New York Times (April 15, 2020) (structural inequality leads to lower baseline health among particular racial and ethnic groups, resulting in a de-prioritization of those patients for ventilators); Yoav Gonen *et al*., *NYC Blacks and Hispanics dying of COVID-19 at twice the rate of Whites, Asians*, The City (April 8, 2020).

39.     In addition, social distancing requirements did not exempt certain "essential workers," like home health aides, nursing home personnel, transit workers, and grocery and delivery personnel, from working outside the home. Yet, their work directly or indirectly decreased the pressure on the healthcare system at the peak of the epidemic in New York City. Most importantly, Black and Latinx people disproportionately fill essential worker roles,

working full time and commuting via public transportation. *See* Stringer, *New York City's Frontline Workers*, *supra* at ¶35.

40.      The crisis created by the pandemic in Black and Latinx communities, *i.e.,* the likelihood that racial disparities would characterize infection, severity, and deaths in a pandemic, was foreseeable to the City.  Epidemiologists studying the social determinants of health reported racial disparities related to <u>policy</u>, not susceptibility to contagion, influenced morbidity and mortality from the H1N1 influenza virus, the last viral epidemic.  *See* Sidney Fussell, *The H1N1 Crisis Predicted Covid-19's Toll on Black Americans,* Wired (May 6, 2020) (citing Sandra Crouse Quinn, et al*., Racial Disparities in Exposure, Susceptibility, and Access to Health Care in the US H1N1 Influenza Pandemic,* 101 Am J Public Health 285 (Feb. 2011) *and* Supriya Kumar, Sandra Crouse Quinn, et al., *The Impact of Workplace Policies and Other Social Factors on Self-Reported Influenza-Like Illness Incidence During the 2009 H1N1 Pandemic*, 102 Am J Public Health 134 (Jan. 2012) (lack of sick leave, greatest among Latinos, is central factor resulting in H1N1 exposure of five million people).

41.      Understanding of the risks of COVID-19, a novel coronavirus, was still evolving in April 2020.  Yet, it was becoming clear that even a casual encounter with the police could have been fatal. In the context of COVID-19, public understanding evolved at exactly the same rate as scientific understanding. In January 2020, COVID-19 was compared to influenza and publicly dismissed as a significant concern for the United States. By February 2020, cases were filtering into the United States, but the virus was seen as primarily a threat to older people and children were believed to be immune or not susceptible to severe infection. By March 2020, cases skyrocketed in New York City, but nearly half of American infections included people under 50 years of age, like Mr. Elliott and his family.

42.     By April 2020, racial disparities in COVID-19 infection, severity, and fatalities showed that Black and Latinx communities were particularly impacted by COVID-19. *See* NYC Health, *Age adjusted rate of fatal lab confirmed COVID-19 cases per 10,000 by race/ethnicity group* (April 6, 2020) available at https://www1.nyc.gov/assets/doh/downloads/pdf/imm/covid-19-deaths-race-ethnicity-04162020-1.pdf (showing 22.8 deaths per 10,000 Hispanic New Yorkers and 19.8 deaths per 10,000 Black New Yorkers, in contrast to 10.2 deaths per 10,000 White New Yorkers).  By early May 2020, a rare and previously unseen toxic reaction, pediatric multi-system inflammatory syndrome ("PMSIS"), began appearing in children, even as New York City cases decreased. *See* Pam Belluck, *A New Coronavirus Threat to Children,* New York Times (May 13, 2020) available at https://www.nytimes.com/article/kawasaki-disease-coronavirus-children.html. The 110 children already diagnosed in New York City were largely Black and Latinx and some incubated COVID-19 for up to six weeks before developing symptoms or PMSIS. *See* Anna Sanders, *NYC detects 110 cases of mysterious coronavirus-tied syndrome in children – most are black and Hispanic*, N.Y. Daily News (May 15, 2020) available at https://www.nydailynews.com/coronavirus/ny-coronavirus-syndrome-mystery-children-black-hispanic-new-york-city-20200515-3f7ovpdhhza3ngagquftoaraxy-story.html.

43.     Studies at the time of Mr. Elliott's arrest fed public concern, anxiety, and understanding. The research at the time already suggested that COVID-19 was far more contagious than initially reported, which ultimately proved true. *See* Jonathan Shaw, *COVID-19 May Be Much More Contagious Than We Thought*, Harvard Magazine (May 13, 2020) available at https://harvardmagazine.com/2020/05/r-nought  (new research suggests each infected person may infect five to six others, *i.e.,* $R^0$ comparable to smallpox); Jessica Flores, *Simply talking in confined spaces may be enough to spread the coronavirus, researchers say*, USA Today (May

13, 2020) available at https://www.rrstar.com/zz/news/20200514/simply-talking-in-confined-spaces-may-be-enough-to-spread-coronavirus-researchers-say. This trajectory confirms serious, unpredictable risk, and a need for the highest level of care with respect to communities particularly at risk.

**NYPD Enforcement of Social Distancing Targeted Black and Latinx Persons**

44.    Citywide, throughout March, April, and May of 2020, the Legal Aid Society confirmed NYPD enforcement of social distancing involved stark racial disparities that cannot not be explained by citizen complaints about social distancing violations. *See* The Legal Aid Society, *Racial Disparities in NYPD's COVID-19 Policing: Unequal Enforcement of 311 Social Distancing Calls*, (May 2020) available at https://legalaidnyc.org/racial-disparities-in-nypds-covid-19-policing/. The Legal Aid Society report found that NYPD responses to 311 complaints for social distancing violations are considerably more likely to result in a summons or arrest in majority Black or Latino precincts. *Id.*  18 of the 20 precincts with the highest rates of known social distancing arrests or summonses per 10,000 people are in majority Black and Latino precincts but, of the 32,293 social distancing complaints made through 311 between March 28 to May 12, slightly less than half (46.2%) of the complaints concerned violations in majority Black and Latino precincts.  *Id.* While four of the five precincts receiving the most social distancing complaints through 311 were in majority-white neighborhoods, four of the five precincts with the most COVID-19 related arrests and summonses were in neighborhoods that are majority Black and Latinx. *Id.* In this vein, 78.9% of summonses and 74.1% of arrests for which the Legal Aid Society was able to identify a precinct occurred in majority Black and Latino precincts. *Id.*

45.    In addition, there was not evidence that NYPD-specific enforcement of social distancing, or conducting low-level stops, was beneficial or effective to public health or safety. NYPD enforcement of social distancing has not proven effective to manage COVID-19 public

health or public safety concerns. No evidence suggests these interventions kept the community safer, from viruses or violence.  *Compare* Christopher M. Sullivan & Zachary P. O'Keeffe, *Evidence that curtailing proactive policing can reduce major crime*, 1 Nature Human Behavior 737 (2017) available at https://www.nature.com/articles/s41562-017-0211-5 (sharp reductions in proactive policing by NYPD in 2014-2015, including 90%+ drop in summonses accompanied *decreases* in major crime complaints citywide); Sarah Lustbader, *What's Not To Love About The NYPD Slowdown?,* The Appeal (Sept. 3, 2019) available at https://theappeal.org/whats-not-to-love-about-the-nypd-slowdown/ (NYPD work stoppage after Eric Pantaleo was fired showed decrease in summonses and decline in major crime).

46.    In addition, in many NYPD interactions enforcing social distancing, NYPD personnel fail to use personal protective equipment or otherwise protect the health and safety of the citizens with whom they interact. On May 7, 2020, Time reported that in many videos depicting NYPD social distancing enforcement arrest, officers were not wearing masks or were incorrectly wearing masks. *See* Josiah Bates, *'We Cannot Police Our Way Out of a Pandemic.' Experts, Police Union Say NYPD Should Not Be Enforcing Social Distance Rules Amid COVID-19*, Time (May 7, 2020.

47.    NYPD enforcement of social distancing appears to replicate the racial disparities and racial profiling of low-level encounters, Terry stops, and arrests for offenses like jaywalking or fare evasion. *Compare* Samar Kurshid, *NYPD Continues Move Away from Criminal Penalties for Low-Level Offenses, But Racial Disparities Remain*, The Gotham Gazette (Sept. 4, 2019) ("91% of criminal summonses were given to people of color….Officers continue to use an exception that allows them to give out a criminal summons instead of a civil fine, vaguely citing "law enforcement reason" as a criteria."); Samoylov, M. and Kuntzman, G., *NYPD Targets*

*Blacks and Latinos for 'Jaywalking' Tickets*, StreetsBlogNYC (Jan 8, 2020) (90% of people stopped for jaywalking by NYPD are Black and Latinx; one-third of jaywalking tickets given in the Bronx); Brand, D., *Nearly every single person arrested for weed in NYC this year was Black or Latinx*, Queens Daily Eagle (Aug. 21, 2019) ("Black and Latinx New Yorkers accounted for 94 percent of all low-level marijuana arrests" mirroring "persistent disparities in fare evasion arrests"); Mueller, B., et al., *Surest Way to Face Marijuana Charges in New York: Be Black or Hispanic*, The New York Times (May 13, 2018) (despite NYPD claim racial disparity driven by local complaints, "among neighborhoods where people called about marijuana at the same rate, the police almost always made arrests at a higher rate in the area with more black residents").

48.    At the time, the most visible, and intentional, selective enforcement of social distancing were the jam-packed New York City public parks, where unmasked people in close proximity and in crowds have been evident daily throughout this period. *See e.g.,* Joseph Goldstein and Corey Kilgannon, *Balmy Weekend Presents a Challenge: New Yorkers Rushing to Parks*, N.Y. Times (May 2, 2020; *Coronavirus Cabin Fever: Crowds Flock To Central Park Even As Social Distancing Enforcement Remains In Effect*, CBS Local N.Y. (April 25, 2020); Jen Carlson, *Photos Show NYC Parks Still Bustling During The Global Pandemic*, Gothamist (Mar. 28, 2020); Sarah Dorn, et al., *People flock to NYC-area bars, beaches as 'quarantine fatigue' intensifies*, N.Y. Post (May 16, 2020). This was explicitly recognized as a racialized selective enforcement in the international media and in the public realm. *See e.g.,* Poppy Nour, *A tale of two cities: how New York police enforce social distancing by the color of your skin,* The Guardian (May 4, 2020) ("outrage has sparked over juxtaposed images that show officers handing out masks to white sunbathers, while another video shows an officer punching a person of color and sitting on him following a dispute about social distancing").

49.     In addition, NYPD did not act to enforce obvious social distancing needs on public transportation inside subway cars and buses, closed systems with particularly attendant risks heavily relied upon by Black and Latinx essential workers to commute daily, even though the executive orders applied to businesses in New York City and affirmed their obligations to mitigate risk in serving customers.  Subways and buses became more crowded as service cuts limited the number of trains and buses running but NYPD enforcement did not acted to protect public health in this context. *See* Christina Goldbaum and Lindsay Rogers Cook, *They Can't Afford to Quarantine. So They Brave the Subway,* The New York Times (Mar. 30, 2020).

50.     Police data also revealed that, during the relevant period, overwhelmingly, NYPD enforcement of social distancing was against Black and Latinx communities and persons. *See e.g.,* Josiah Bates, *Police Data Reveals Stark Racial Discrepancies in Social Distancing Enforcement Across New York City*, TIME (May 8, 2020) (68% of those arrested for social distancing violations in New York City between March 16 and May 5 were Black and 24% were Hispanic); Ashley Southall, *Scrutiny of Social-Distance Policing as 35 of 40 Arrested are Black,* The New York Times (May 7, 2020) (35 of 40 people arrested for social distancing violations in Brooklyn between March 17 and May 4 were Black, four were Hispanic, and one was white). On May 8, 2020, the Bronx Daily reported on recent social distancing enforcement statistics and embedded a figure depicting the racially disproportionate data. *See* Jonas Bronck, *NYPD COVID-19 Summons Enforcement Data*, The Bronx Daily, (May 8, 2020); *see also* Maya Rajamani, *Vast majority of social distancing summonses in NYC went to black and Hispanic residents*, 1010 WINS (May 8, 2020) available at https://www.politico.com/states/new-york/albany/story/2020/05/08/black-and-latino-new-yorkers-get-vast-majority-of-social-distancing-summonses-1283223.

51.     Citizen journalists, professional reporters, and concerned citizens also came forward to speak out about unjustified police encounters and stops and racial profiling toward Black and Latinx persons in NYPD enforcement of social distancing during the relevant period. On April 3, 2020, the Intercept reported on NYPD enforcement of social distancing, including an NYPD social distancing action in Bedford Stuyvesant, Brooklyn, where police pepper-sprayed a crowd of people in a parking lot. Alice Speri, *NYPD's Aggressive Policing Risks Spreading the Coronavirus,* The Intercept, (April 3, 2020), available at https://theintercept.com/2020/04/03/nypd-social-distancing-arrests-coronavirus/.

52.     Such incidents were widespread in contemporaneous social media reporting as well. On April 10, 2020, a witness to NYPD enforcement of social distancing on a subway platform posted a video depicting NYPD Officers detaining and handcuffing a man who had indicated the subway platform was too crowded to socially distance as directed.  Bystanders audible in the video implied the escalation to arrest was in retaliation for the use of coarse or vulgar language against the police. This video was posted on Twitter, a public social media platform. *See* Real Justice, @RealJusticePAC, Twitter, (April 10, 2020, 11:31 a.m.), https://twitter.com/RealJusticePAC/status/1248634593638592514.  In another event, on April 11-13 2020, Rebecca Kavanaugh, an attorney admitted to practice in New York State, posted a video involving the "social distancing detention" of a young Black child on a Harlem subway platform, on Twitter, a public social media platform. Rebecca Kavanagh @DrRJKavanagh, Twitter, (April 11, 2020, 10:00 p.m.) https://twitter.com/DrRJKavanagh/status/1249155279293493249, (April 12, 2020, 10:39 a.m.) https://twitter.com/DrRJKavanagh/status/1249346403350044672, and (April 13, 2020, 6:13 a.m.), https://twitter.com/DrRJKavanagh/status/1249641953274331136. The videos depicted the

detention of a young Black child on a Harlem subway platform and the eventual arrest of the child's guardian.

53.     On May 2, 2020, in a video posted on Twitter, a public social media platform, there was a heavy police presence in Brownsville, Brooklyn, a Black neighborhood in New York City.  The video depicted multiple NYPD Officers, many of whom were not wearing masks, detaining multiple Black men in Brownsville, Brooklyn. In the video, police enforcing social distancing restrictions, and in the middle of handcuffing one Black man, noticed another Black man walking very slowly toward them in the street, ran up on him, grabbed him by the throat, tackled him to the ground and proceeded to handcuff him. Why Accountability, @WA_tweets, Twitter, (May 3, 2020, 8:41 a.m.) https://twitter.com/WA_Tweets/status/1256926903275061248.

54.     On May 3, 2020, during NYPD enforcement of social distancing in the Lower East Side of Manhattan, in New York City, NYPD Officer Francisco Garcia approached a bystander, NYCHA employee Donni Wright, while firing his taser and instructing him to move back.  Officer Garcia was not wearing a mask. He approached Mr. Wright, accused him of "flexing" and then immediately tackled Mr. Wright to the ground. He began punching Mr. Wright in the head and body, dragged him on the ground, and kneeled on his head while a fellow officer observed and then assisted in handcuffing Mr. Wright. A video of this incident went viral and is included in this herein referenced article. *See* John Del Signore, *Video: NYPD Officer Beats Bystander, Kneels On His Head During Social Distancing Enforcement*, Gothamist, (May 3, 2020).

55.     On May 3, 2020, Hawk Newsome, the chairperson of Black Lives Matter Greater New York, was pretextually stopped on the claim of social distancing enforcement as he video-recorded police officers in the Melrose area of the Bronx, in New York City.  Although he was

walking with only one person and legally video recording the police who were interfering in a funeral service in the Bronx, the officers repeatedly instructed him to disperse.  Mr. Newsome retained six feet of distance from his walking companion. The police officer instructing Mr. Newsome was not wearing a mask.  On May 5, 2020, a video was posted on Instagram, a public social media platform. The video, posted by congressional candidate and witness, Chivona Renée Newsome, newyorkvonni, Instagram, (May 3, 2020), https://www.instagram.com/tv/B_v4RAyHdUu/?utm_source=ig_embed, depicted the arrest of Hawk Newsome who was protesting the NYPD dispersing of a funeral in the Bronx and Ms. Newsome indicated they were recording because the police had pepper sprayed an entire family gathered for a funeral service immediately prior to the video. *See also* Royce Dunmore, *Graphic Videos Show NYPD Terrorizing Same Black Communities Being Killed By Coronavirus*, News One (May 5, 2020) available at https://newsone.com/3936823/videos-show-nypd-terrorizing-same-black-communities-killed-by-coronavirus/.On May 4, 2020, a video was posted on Twitter, a public social media platform, showed multiple officers detaining, pushing, and approaching people without masks, gloves, or other protective equipment. Why Accountability, @WA_tweets, Twitter, (May 4, 2020, 9:42 p.m.) https://twitter.com/WA_Tweets/status/1257485915112517632.

56.     Such incidents were occurring citywide. On May 4, 2020, a video depicting uniformed officers violently arresting a young Black man showed three officers detaining and punching the young man.  On the apparent guise of social distancing enforcement, the officers repeatedly instructed the bystanders video recording the interaction to go inside.  Eventually, the officer ran warrant checks of the bystanders and the video ends as the officer informs the videographer that he has an I-card and grabs his cell phone. The video was posted on Twitter, a

public social media platform. *See* Anthony Beckford (City Council Candidate),

@Vote4Beckford, Twitter, (May 4, 2020, 8:39 p.m.),

https://twitter.com/Vote4Beckford/status/1257469870524051457. On May 8, 2020, NYPD

Officers detained approximately eight young Black adolescent boys forced to kneel up against

fence in apparent social distancing enforcement. The videographer narrated and captured the

presence of uniformed officers, plainclothes officers, and a white-shirted supervisor. This video

was posted on Twitter, a public social media platform. *See* Tariq Nasheed @tariqnasheed,

Twitter, (May 8, 2020, 6:21 p.m.),

https://twitter.com/tariqnasheed/status/1258884734551113729.

57.    The public service announcements by NYPD also varied by neighborhood in

racialized ways. During the same period, in the Nolita neighborhood of Manhattan, NYPD

broadcast a friendly reminder from a patrol car cruising the neighborhood on a regular basis to

observe social distancing restrictions.  The announcement says, in sum and substance, "This is

the New York City Police Department. Due to the current health emergency, members of the

public are reminded to keep a safe distance of 6 feet from others while in public places to reduce

the spread of the coronavirus. Please help us keep you safe, thank you for your cooperation." *See

also* Olivia Bensimon, *NYPD patrol car plays coronavirus PSA over loudspeaker at NYC park*,

N.Y. Post (Mar. 25, 2020) available at https://nypost.com/2020/03/25/nypd-patrol-car-plays-

coronavirus-psa-over-loudspeaker-at-nyc-park/.

58.    On the contrary, in Queensbridge, a Twitter user noted that "Cops all over Vernon

Boulevard by Queensbridge Projects locking people up for being outside, broadcasting a PSA

that they've been ordered to dispersed by @NYGovCuomo" and referenced an attached video

showing dozens of police officers occupying the courtyard of Queensbridge Houses, and

broadcasting a public service announcement threatening arrest. The public service announcement indicated: "Warning: These gatherings are prohibited. This is the New York City Police Department. Gatherings of any kind have been prohibited by the governor and by the mayor. This gathering is unlawful and you are ordered to disperse. If you fail to disperse immediately, you are subject to arrest." This video was posted on Twitter, a public social media platform. See UpFromTheCracks, @ UpFromTheCracks, Twitter, (May 5, 2020, 10:27 p.m.), https://twitter.com/UpFromTheCracks/status/1257859462288805889?s=20.

59.     Elsewhere in the City, this more threatening PSA was reserved for public protestors gathering in violations of the rules. Upon information and belief, very few of these persons were subject to individual subsequent law enforcement action. *See* Peter Mastrosimone, De Blasio declares protest to be illegal, Queens Chronicle (May 21, 2020) available at https://www.qchron.com/editions/queenswide/de-blasio-declares-protest-to-be-illegal/article_8b72584b-9b07-5713-af7f-75692bf410b0.html (stating the full text of the PSA).

**NYPD Enforcement of Social Distancing has Involved Frequent Retaliation, Use of Force, and Escalation in Retaliation for Coarse or Vulgar Language**

60.     In several cases, the stress of the Covid-19 pandemic was reflected in police responses to citizen dissatisfaction. NYPD enforcement of social distancing escalated when officers retaliated against the legal use of vulgar or coarse language.  For example, on May 5, 2020, NYPD enforcement of social distancing escalated quickly to handcuffing and arrest of a young [woman] situation was not wearing a face mask. *See* Rebecca Kavanagh @DrRJKavanagh, Twitter, (May 5, 2020, 2:32 a.m.), https://twitter.com/DrRJKavanagh/status/1257558718528577538.

61.     On May 13, 2020, Kaleemah Rozier was in the Barclays Center / Atlantic Avenue subway station with her five-year old child.  They were wearing masks, but had exposed their

noses and mouths as they walked on the stairs.  Ms. Rozier later claimed that "when the police

encountered her, she had lowered her mask to breathe more easily while she climbed the subway

steps and talked on the phone." Woman arrested in subway over mask says police were "all in

the wrong.", New York Times (May 19,2020). As she tried to walk away from officers claiming

to enforce social distancing, the officers confronted her and eventually tackled her to the ground

and forcibly arrested her. Dean Meminger, a news reported for NY1, posted on Twitter, a public

social media platform, a video depicting the arrest of the young woman of color. Dean

Meminger, @DeanMeminger, Twitter, (May 13, 2020, 6:22 p.m.),

https://twitter.com/deanmeminger/status/1260697038565638147.  The video depicts the woman

walking up the steps of the and being arrested by multiple NYPD Officers.

**NYPD did not Enforce Social Distancing Restrictions Against White Communities or
People Similarly Situated to Black and Latinx Communities**

62.     Largely, NYPD enforcement of social distancing against white persons and

communities was gentle or nonexistent. *See, e.g*., Poppy Noor, *A tale of two cities: how New

York police enforce social distancing by the color of your skin,* The Guardian (May 4, 2020)

available at https://www.theguardian.com/world/2020/may/04/coronavirus-new-york-police-

enforce-social-distancing ("outrage has sparked over juxtaposed images that show officers

handing out masks to white sunbathers, while another video shows an officer punching a person

of color and sitting on him following a dispute about social distancing.")

63.     In some predominantly white neighborhoods, like Park Slope, Brooklyn (which

includes Prospect Park), large crowds consistently gathering at Prospect Park did not result in

NYPD enforcement of social distancing. On May 12, 2020, Patch reported that the largely white

neighborhood of Park Slope, Brooklyn had experienced no social distancing arrests. *See* Matt

Troutman, Patch Staff, *Not One Social Distancing Ticket For All Of Park Slope: Data*, Patch,

(May 12, 2020), available at, https://patch.com/new-york/parkslope/not-one-social-distancing-ticket-all-park-slope-data.

64.     Accounts of harsh tactics in enforcement of social distancing in Black and Latinx communities, including in Mr. Elliott's community on the days surrounding the incident that occurred to him, have been contrasted with the gentler approach taken in the Hasidic community in Williamsburg, Brooklyn, *see* Ashley Southall *Scrutiny of Social-Distance Policing as 35 of 40 Arrested Are Black*, New York Times (May 7, 2020) ("Officers issued 12 tickets at a recent funeral that drew a crowd of 2,500") or with respect to crowded public parks in white communities. *See also* Ben Yakas, *Brooklyn Yeshiva Allegedly Caught Holding Classes With At Least 60 Students Inside*, Gothamist (May 18, 2020) (police raid an illegal yeshiva with 100 children inside, in violation of social distancing mandates but "NYPD said no summonses were issued against the people operating the school.").

65.     This includes in mourning ceremonies exactly analogous to the circumstances presented in this case, i.e., the unexpected death of a valued community member. During the same period, NYPD monitored or dispersed banned vigils and mourning gatherings in other, non-Black communities without force, violence, citations, or arrests. *See e.g.,* Jason Silverstein, *Hundreds of Hasidic Jews gather in Brooklyn for rabbi's funeral, defying social distancing order*, CBS News (Apr. 7, 2020) (noting dispersal of multiple funerals in Hasidic communities involving "hundreds of mourners" in New York City in March and April of 2020 using loudspeaker announcements and post hoc statements and without any force, violence, or arrests).

66.     This was true throughout the City, including in neighborhoods with smaller public spaces, where people were more concentrated. For example, on May 2, 2020, a photo was posted on Twitter, a public social media platform. *See* Jeremiah Moss @jeremoss, Twitter, (May 2,

2020, 6:41 p.m.), https://twitter.com/jeremoss/status/1256715403188998146. The photo depicted NYPD Officers distributing masks to predominantly white individuals in Washington Square Park. Another photo posted that same day by NYPD itself depicted a white woman being handed a mask by an NYPD Officer. *See* NYPD NEWS, @NYPDnews, Twitter, (May 2, 2020, 3:15 p.m.), https://twitter.com/nypdnews/status/1256663527479279617. On the same day, a photo depicting a large and congested crowd of predominantly white individuals failing to maintain social distancing or wear mask at Christopher St. Pier was published. *See* Welcome2theBronxTM, @Welcome2theBX, Twitter, (May 2, 2020, 9:52 p.m.), https://twitter.com/Welcome2theBX/status/1256763447209066496. Eventually, on May 8, 2020, Gothamist reported that limitations would be put in place to stem the flow of large gatherings in some public parks. Ben Yakas, *NYPD Will Limit How Many People Can Enter Hudson River Park and Domino Park*, Gothamist, (May 8, 2020).

### New York City and State Officials Suggested the Improprieties of the NYPD Enforcement of Social Distancing Were Well-Known or Foreseeable

67.     Brooklyn Borough president, Eric Adams, noted New York's social distancing mandates nowhere set forth criminal conduct: "the enforcement of social distancing is not a crime and we should stop treating it like a crime. It's reculturing. It's rethinking how we have to exist in a COVID, or any virus-like, environment." *See* Jarrett Murphy, *Eric Adams Says Cops Should Not Enforce Social Distancing,* City Limits (May 7, 2020) available at https://citylimits.org/2020/05/07/eric-adams-says-cops-should-not-enforce-social-distancing/.

68.     On May 8, 2020, the New York Daily News reported outrage by New York City public officials upon learning of the racially disproportionate social distancing arrests in New York City. *See* Anna Sanders and Rocco Parascandola, '*That's abysmal': NYC politicians*

*outraged after NYPD reveals 81 percent of social distancing arrests have been minorities*, New

York Daily News, (May 8, 2020).

69.     Some public officials reacted by indicating their unwillingness to participate in

the police-led misconduct. On May 11, 2020, Gothamist reported on the decision of District

attorneys in New York City to decline to prosecute social distancing arrests. NYC District

Attorneys Won't Prosecute Social Distancing Arrests Ordered By De Blasio, Jake Offenhartz,

Gothamist, (May 11, 2020).

70.     Other public officials used their platforms to amplify the unconstitutional and

racialized impact of the policy of NYPD enforcing social distancing. On May 13, 2020, New

York City Comptroller, Scott Stringer, wrote on Twitter, a public social media platform:

"Inhumane. A young child watching their mother slammed to the ground. There is no possible

justification for this. Let me say this AGAIN — the NYPD cannot be involved in social

distancing enforcement." See  Scott Stringer, @NYCComptroller, Twitter, (May 13, 2020, 10:39

p.m.), https://twitter.com/NYCComptroller/status/1260761717866475521 (emphasis in original).

**Statements and Actions of NYPD and City Leadership Show Deliberate Indifference to
Public Concerns About Racially Disparate Policing by NYPD Officers**

71.     The NYPD officers involved in NYPD enforcement of social distancing included

uniformed and plainclothes officers. *See e.g.,* Kim Bellware, *Violent arrest in New York raises*

*questions about police enforcement of social distancing orders*, The Washington Post (May 5,

2020) ("Shea has said there's no "hard and fast rule" on how or even whether plainclothes

officers should aggressively enforce social distancing"). As a matter of course, they had

graduated from the police academy, and received training in appropriate police encounters, the

*de Bour* levels, and permissible stops, questions, and frisks. *See* NYPD Monitor, *Training*,

available at http://nypdmonitor.org/training. Yet the City, the NYPD, and individual officers

showed deliberate indifference despite repeated, real-time notice of the selective enforcement, racial profiling, targeting of Black and brown communities, and use of force rampant during this period. Instead, it consciously chose not to rectify or address the situation.

72.      On May 8, 2020, Gothamist reported on then-Mayor Bill de Blasio's dismissive response to recent disproportionate social distancing enforcement. *See* Jake Offenhartz *De Blasio Shrugs Off Leaked Data Showing Massive Racial Disparities In NYPD's Social Distancing Arrests*, Gothamist, (May 8, 2020).

73.      The then-NYPD Commissioner also rationalized police misconduct and violence, blamed the people being stopped, suggested additional context would have neutralized public concern, and claimed they were largely criminals. *See* Jake Offenhartz, *Police Commissioner Says It's "Dangerous" To Criticize NYPD For Social Distancing Enforcement Disparities*, Gothamist (May 13, 2020). At the time, when challenged regarding the stark racial disparities in stops and summonses issued for social distancing violations, NYPD actually began promoting a statistic that 90% of those arrested for actual crime during the COVID-19 pandemic were Black or Latinx, implying the race of these crime suspects underlined racially discriminatory policing, and racial disparities in stops, in Black and Latinx communities. *See* Anthony M. DiStefano, *COVID-19-related arrests in the city not racially motivated, NYPD says,* Newsday (May 12, 2020) (Legal Aid Society notes the "NYPD definition of 'COVID-related' in this data set is meaningless. Most importantly, it shed no light on the critical question of how the NYPD can explain and begin to address its pattern of racially discriminatory enforcement of social distancing….").

74.      Throughout the COVID-19 crisis, police misconduct was publicly defended, rather than addressed, by police leadership. *See e.g., Coronavirus News: Mom arrested after*

*subway confrontation with NYPD over mask*, Eyewitness News 7 (May 14, 2020) available at https://abc7ny.com/viral-video-violent-arrest-kaleema-rozier-nypd/6196707/ ("We are confident that the police officers in this incident acted appropriately and with respect," the [NYPD] said. "This individual was arrested only after her behavior toward officers warranted police action."); Michael R. Sisak, *Violent Arrest Raises Concerns About NYPD Distancing Patrols*, The Associated Press (May 3, 2020) ("Police spokeswoman Sgt. Mary Frances O'Donnell said Wright 'took a fighting stance against the officer' when he was ordered to disperse"); Kathleen Culliton, *Punching Isn't Excessive Force, NYPD Commissioner Says*, Patch (May 6, 2020) available at https://patch.com/new-york/new-york-city/punching-isnt-excessive-force-nypd-commissioner-says (NYPD Commissioner Dermot Shea stated publicly, "A punch should not be assumed to be excessive force.").

75.     On May 13, 2020, NYPD then-Commissioner Shea spoke at a Mayor's Press Availability, and refused to consider any possibility of racial discrimination among the police: "I will push back strongly on any notion that this is business as usual for the NYPD or that this is 'racist police.' I think this could not be anything further from the truth. Let's remember, we are a minority-majority police department – fact." Shea also suggested current racial profiling claims were merely creations of the media: "I would urge caution to everyone now to honestly, before a press conference is held on a ten second video of a street brawl in the middle of the day in Brooklyn in broad daylight, by the way, before it's turned into an agenda for a press conference." See *Transcript: Mayor de Blasio Holds Media Availability*, May 13, 2020, available at https://www1.nyc.gov/office-of-the-mayor/news/344-20/transcript-mayor-de-blasio-holds-media-availability.

76.     On May 13, 2020, Police Commissioner Dermot Shea also responded to a question during Mayor Bill De Blasio's daily briefing and stated:

> We have issued a small number of summonses, even fewer arrests tied to COVID. Are they mostly to minority members of this city? Yes, they are. And I think you knew that answer before you asked the question, but no one is talking about the disparity of the last ten homicide victims in New York City, and I think that should be spoken about or the victims of robberies across the city. Disparities exist in every facet of life, not just in New York City but in this country and it's rooted in much deeper issues than the New York City Police Department.

*Transcript: Mayor de Blasio Holds Media Availability*, May 13, 2020, available at https://www1.nyc.gov/office-of-the-mayor/news/344-20/transcript-mayor-de-blasio-holds-media-availability. *See also* Craig McCarthy, *Dermot Shea defends NYPD after racism claims over social-distancing stops*, New York Post (May 13, 2020) (NYPD Commissioner offered "an extremely heated rant" dismissing claims of racism and offering broad, racialized justifications for NYPD misconduct: "they fight when they go to court, they have open gun cases, they are gang members, and we expect our police officers to do the best they can.").

77.     In addition, there has been no clear and transparent guidance with respect to NYPD enforcement of social distancing as it rolled out, in operation, and in the current claim of a partial rollback.  *See e.g.,* Kim Bellware, *Violent arrest in New York raises questions about police enforcement of social distancing orders,* The Washington Post (May 5, 2020) ("Shea has said there's no "hard and fast rule" on how or even whether plainclothes officers should aggressively enforce social distancing").

**Selective enforcement, racial profiling, and the misconduct set forth in this case have been declared improper and unconstitutional existing 'policy or practice' of the City in the Southern District of New York**

78. Notably, this misconduct was already prohibited in New York City and NYPD was under judicial oversight for racial profiling in police stops and searches. *Floyd, et al. v. City of New York* challenged the NYPD's practice of racially profiling and unconstitutionally stopping and frisking New York City residents. In the nine-week Floyd trial, Judge Shira Scheindlin of the Southern District of New York heard evidence of the NYPD's stop-and-frisk practice, and its particular impact on young Black and Latinx men. The court found that the NYPD's policies and practices were unconstitutional and racially discriminatory, and it detailed a set of remedies to bring those practices into constitutional compliance. *See Floyd v. City of New York*, 959 F.Supp.2d 540 (S.D.N.Y 2013) (Liability Opinion) *and see Floyd v. City of New York*, 959 F.Supp.2d 668 (S.D.N.Y 2013) (Remedies Opinion).

79. Since 2013, the plaintiffs in *Floyd*, and a companion cases regarding NYPD racial profiling in NYCHA public housing, *Davis v. City of New York*, 10-CV-0699 (AT) (S.D.N.Y.), have been engaged in a remedial process with the NYPD and a court-appointed Monitor. The remedial process intended to create broad, systemic change is ongoing. This includes initial revisions to the NYPD Patrol Guide regarding its stop-question-and-frisk policy, widespread retraining, and other remedial efforts to reform these unconstitutional practices.

80. The court appointed Monitor's Ninth Status Report, filed in January 2020, was the last update prior to Plaintiff Roland Elliott's encounter with NYPD outside his home. That report detailed particular issues regarding NYPD officers' significant underreporting of the stop-and-frisks that they conduct, a widespread failure on the part of NYPD supervisors to detect and take corrective action regarding unconstitutional stops-and-frisks conducted by subordinate officers, as well as ongoing problems with the NYPD's systems for disciplining officers who commit

misconduct during stops, and auditing the constitutionality of officer stop-and-frisk activity.[1]

Even changes in the language of policy and procedure had not necessarily disrupted these racial

profiling and racialized policies and practices.

81.     Despite allegedly updating its policy regarding stops, questions, frisks, searches,

and the use of force, and participating in considerable training in this regard, significant racial

disparities persist in enforcement in Black and Latinx communities, particularly in public

housing in New York City.

82.     Upon information and belief, NYPD supervisors continued dismissing, ignoring,

or justifying selective enforcement, racial profiling, and other practices reflecting consistent

misconduct throughout the relevant period, including  to pressure patrol officers to heavily police

Black communities during the pandemic. These unconstitutional and unlawful practices persist

within a context of impunity, and the continued expectation of impunity, as high level

investigations have made clear that the NYPD fails to discipline patrol officers accused of

misconduct, even when complaints are substantiated by the Civilian Complaint Review Board

("CCRB"). *See generally*, Mary Jo White, *The Report of the Independent Panel on the

Disciplinary System of the New York City Police Department* (Jan. 25, 2019).

83.     Defendants' conduct, including in these ongoing unlawful policies and practices,

caused Mr. Elliott to suffer loss of liberty, physical, emotional, and psychological pain, anxiety,

loss of sleep, stress, embarrassment, fear, humiliation, and deprived him of his constitutional

rights.

## COMPLIANCE WITH NEW YORK GENERAL MUNICIPAL LAW

84.     By and through counsel, Mr. Elliott timely served a Notice of Claim upon the City

of New York via eClaim on October 6, 2020, past ninety days from the events giving rise to this

---

[1] *Floyd, et al. v. City of New York*, 08-CV-1034 (AT), Dkt.# 680 (S.D.N.Y. Jan. 11, 2019).

claim but well within the tolling period set forth by New York State Executive Orders 202.67 and  202.8. He received a receipt numbered 202000073868.

85.     On September 30, 2021, Mr. Elliott attended an examination pursuant to New York General Municipal Law § 50-h.

86.     More than thirty days have elapsed since Plaintiff served his Notice of Claim and the City has not offered adjustment or payment of his claim.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violations of the Fourth, Fifth, and Fourteenth Amendments

87.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

88.     In committing the acts and omissions complained of herein, the CITY OF NEW YORK, NYCHA, and Defendants NYPD OFFICERS Eric S. Dym, JOHN DOE and JANE DOE, and JOHN DOES 1-10 ("Individual Defendants")  acted under color of state law to deprive Plaintiff of certain constitutionally protected rights under the Fourth Amendment to the United States Constitution, including, but not limited to:

      a.   the right to be free from selective enforcement of the law

      b.   the right to be free from unreasonable search and seizure;

      c.   the right to be free from arrest without probable cause;

      d.   the right to be free from use of excessive force;

      e.   the right to be free from false imprisonment, that being wrongful detention without good faith, reasonable suspicion, or legal justification, and of which detention Plaintiff was aware and to which he did not consent;

    f.  the right to be free from the lodging of false criminal charges against him by police officers;

    g.  the right to be free from wrongful prosecution; and

    h.  the right to equal protection, privileges, and immunities under the laws.

89.    In committing the acts and omissions complained of herein, Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

90.    The City has acted with deliberate indifference to the Fourth, Fifth, and Fourteenth Amendment rights of Plaintiff. As a direct and proximate result of the acts and omissions of the City, Plaintiff has been been deprived of rights under the Fourth Amendment to the United States Constitution and 42 U.S.C. § 1983.

91.    As a direct and proximate result of Defendants' deprivation of Plaintiff's constitutional rights, Plaintiff suffered the injuries and damages set forth above.

92.    The unlawful conduct of the Individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

### Second Claim for Relief
### Violations of the
### Equal Protection Clause

93.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

94.    In committing the acts and omissions complained of herein, CITY OF NEW YORK, NYCHA, Defendants NYPD OFFICERS Eric S. Dym, JOHN DOE and JANE DOE, and JOHN DOES 1-10 ("Individual Defendants")  acted under color of state law to deprive Plaintiff of certain constitutionally protected rights.

95.     Acting under color of state law, Defendants have selectively applied enforcement practices against all Mr. Elliott and those in his community, intentionally discriminatory and race-based manner. Defendants have focused enforcement and harsh and unlawful enforcement practices in African-American and Latinx communities.

96.     Defendants have targeted communities of color, such as NYCHA Residences, for selective enforcement, as residents in-and visitors to-these buildings are inhabited almost entirely by African Americans and Latinos. This pattern of targeted enforcement is evident even when controlling for other factors, like the COVID-19 pandemic.

97.     Defendants have acquiesced in, ratified, and/or failed to check widespread violations of Plaintiffs' constitutional rights to be free from unreasonable searches and seizures, because of Plaintiff's race.

98.     These constitutional abuses were, and are, directly and proximately caused by policies, practices, and/or customs devised, implemented, enforced, encouraged, and/or sanctioned by the City and NYCHA, including: (a) targeted implementation of COVID-19 and social distancing enforcement in communities of color; (b) the discriminatory failure to adequately and properly screen, train, support, and/or supervise NYPD officers deployed in communities of color; and (c) the discriminatory failure to adequately and properly monitor, investigate and/or discipline NYPD officers engaged in racial bias and discrimination.

99.     In committing the acts and omissions complained of herein, CITY OF NEW YORK, NYCHA,Defendants NYPD OFFICERS Eric S. Dym, JOHN DOE and JANE DOE, and JOHN DOES 1-10 ("Individual Defendants")  acted under color of state law to deprive Plaintiff of certain constitutionally protected rights under the Fourth, Fifth, and Fourteenth Amendment to the United States Constitution, including, but not limited to:

   a.   the right to be free from selective enforcement of the law

   a.   the right to equal protection under the law and due process of law

   b.   the right to be free from unreasonable search and seizure;

   c.   the right to be free from arrest without probable cause;

   d.   the right to be free from use of excessive force;

   e.   the right to be free from false imprisonment, that being wrongful detention without good faith, reasonable suspicion, or legal justification, and of which detention Plaintiff was aware and to which he did not consent;

   f.   the right to be free from the lodging of false criminal charges against him by police officers and;

   g.   the right to equal protection, privileges, and immunities under the laws.

100.   In committing the acts and omissions complained of herein, Defendants breached their affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

101.   As a direct and proximate result of Defendants' deprivation of Plaintiff's constitutional rights, Plaintiff suffered the injuries and damages set forth above.

102.   The unlawful conduct of the Individual Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.


### Third Claim for Relief
**42 U.S.C. § 1983**
**Violations of Plaintiff's Fourth and Fourteenth Amendment Rights**

103.   Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

104.    The unconstitutional conduct of the Individual Defendants was directly and proximately caused by *de facto* policies, practices, and/or customs devised, implemented, enforced, encouraged, and sanctioned by the City whereby written policies are ignored in practice in favor of *de facto* policies.

105.    Defendant CITY OF NEW YORK and Defendant NYCHA developed and maintained customs, policies and practices exhibiting deliberate indifference to the constitutional rights of its citizens, including but not limited to the right to be free from racial discrimination, to the right to be free selective enforcement of the law, and to the right to be free racial bias by public officials, which caused the violations of Plaintiff's rights.

106.    It was a custom, policy, and/or practice of the City to selectively enforce the law with respect to public health and other restrictions during the COVID-19 pandemic individuals, particularly Black individuals, without reasonable suspicion.

107.    It was a custom, policy, and/or practice of the City and of NYCHA to enable, license, or disregard as agents of the City selectively enforced the law in certain communities, particularly those public housing communities heavily populated by Black and Latinx individuals, like Mott Haven Houses, without reasonable suspicion.

108.    During the relevant period, it was a custom, policy, and/or practice of the City to disproportionately surveil, stop, question, and frisk, issues summons to and/or arrest, and use force against Black and Latinx individuals on pretextual grounds, and without reasonable suspicion, including in public housing, in the early months of the COVID-19 pandemic.

109.    During the relevant period, the CITY OF NEW YORK and Defendant NYCHA continue to pressure officers to intervene in public health and mental health related scenarios, for

which police intervention may be unwarranted, harmful and unsuited to the issues at hand and for which these officers are neither properly trained nor ably equipped.

110.    The CITY OF NEW YORK and Defendant NYCHA have developed and maintained a culture of deliberate indifference, and impunity, with respect to best practices for constitutional and non-biased encounters. Defendants have created a *de facto* NYPD policy of selective enforcement, harassment, and control.

111.    The CITY OF NEW YORK has developed and maintained this culture of indifference and impunity with respect to police encounters with Black New Yorkers despite foreseeable and known enhanced risk to these individuals in the early months of the COVID-19 pandemic.

112.    The CITY OF NEW YORK and Defendant NYCHA have failed to properly train NYPD officers on best practices for constitutional and non-biased encounters, particularly in uncertain and emergency times, and to properly supervise its officers to ensure that they are implementing these best practices.

113.    The CITY OF NEW YORK caused the deprivation of the constitutional rights of Black New Yorkers in communities targeted for selective enforcement, which was a reasonably foreseeable consequence of, and substantially caused by, the municipality's failure to supervise COVID-19 enforcement, and the activities of individual members of service during the COVID-19 pandemic.

### Fourth Claim for Relief
### Claims under Title VI of the Civil Rights Act of 1964, 42 USC § 2000d *et seq.*

114.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

115.    Like other residents of NYCHA, Plaintiff Elliott is unable to use and enjoy his home, residence, and community because Defendants' selective enforcement of the law are conducted in such a consistently unlawful and discriminatory manner that the residents are not free to come and go as they wish and experience a fundamental loss of liberty in their everyday lives. Plaintiff, his family, friends, and guests are harassed and intimidated by unlawful and selective enforcement of the law.

116.    Mr. Elliott and his community are among the intended beneficiaries of Defendants' programs and/or activities receiving federal financial assistance. The Defendants' discriminatory practices prevent Plaintiffs from fully participating in and receiving the benefits of the programs and activities supported by federal funds. Mr. Elliott, his family, and his friends are unable to enjoy the rights and privileges associated with tenancy in NYCHA Residences. Among other things, he entitled to receive police protection by the NYPD, but is instead victimized by the NYPD's unlawful and discriminatory police activities.

### Fifth Claim for Relief
**Unlawful Discrimination under the Fair Housing Act of 1968 (Title VIII)**

117.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

118.    Defendants have, as described above, violated, and/or continue to violate, the rights of Plaintiff Elliott and his family under the Fair Housing Act, 42 U.S.C. § 3601 et seq., and implementing regulations by: (a) discriminating on the basis of race and/or national origin in the terms, conditions, or privileges of the provision of services or facilities in connection with the sale or rental of a dwelling, in violation of 42 U.S.C. § 3604(b) and the corresponding implementing regulations; and (b) discriminating on the basis of race and/or national origin in

the exercise or enjoyment of a dwelling by coercion, intimidation, or interference, in violation of 42 U.S.c. § 3617 and implementing regulations.

119.     By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latinx NYCHA residents due to their race or ethnicity, and/or national origin-or the racial composition of their building-in violation of the Fair Housing Act.

120.     The past and continuing acts and conduct of Defendants described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Plaintiff Mr. Elliott or his family or his community.

121.     Defendants' policies, patterns, and practices have had, and continue to have, an adverse and discriminatory impact on African Americans and Latinos that is not justified by necessity.

122.     Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to Mr. Elliott, his family, and his community.

## Sixth Claim for Relief
### Claims under the United States Housing Act, 42 U.S.C. § 1437

123.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

124.     Acting under color of state law, Defendants have, as described above, violated, and/or continue to violate, the rights of Mr. Elliott, his family, and his community, under the United States Housing Act, 42 U.S.C. § 1437, its implementing regulations, 42 U.S.C. § 1983, and the federal and New York State Constitutions, by failing to provide reasonable accommodation of the Mr. Elliott, his family, and his community.

125.     Residents of NYCHA, including Mr. Elliott, his family, and his community, are unable to use and enjoy their residences and the immediately surrounding outside environs in the community because Defendants' unlawful selective enforcement policies and practices render NYCHA residents unable to come and go freely as they wish and cause their family, friends, and guests to be subject to constant harassment and intimidation.

126.     The past and continuing acts and conduct of Defendants described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of the Plaintiff Mr. Elliott or his family or his community.

127.     Defendants' policies, patterns, and practices interfere with the ability of Mr. Elliott, his family, and his community to live freely in their communities, to accommodate guests because their family, friends, and guests are harassed, intimidated, and subject to unlawful, selective, and biased enforcement of the law. Defendants' policies, patterns, and practices have had, and continue to have, an adverse and discriminatory impact on African Americans and Latinos that is not justified by necessity.

128.     Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying adequate housing to Mr. Elliott, his family, and his community.

<u>Seventh Claim for Relief</u>
**Unlawful Discrimination under 42 U.S.C. § 1981**

129.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

130.     By the actions described above, Defendants have continually denied Mr. Elliott, his family, and his community the same rights to make and enforce contracts as enjoyed by white citizens of the United States, in violation of 42 U.S.C. § 1981. Mr. Elliott, his family, and his

community have been denied the enjoyment of the benefits, privileges, terms, and conditions of their contractual relationship with NYCHA, because they are limited in their ability to enter and exit their own homes, to live freely in their communities, to receive guests, due to Defendants' selective enforcement policies and practices, which are conducted in a discriminatory and unlawful manner.

131.   By the actions described above, Defendants have also denied Mr. Elliott, his family, and his community the full and equal benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens, and have subjected them to disparate forms of punishment, pains, penalties, taxes, licenses, and exactions, as compared to white citizens of the United States, in violation of 42 U.S.C. § 1981. Mr. Elliott, his family, and his community have been injured by Defendants' discriminatory and unlawful trespass enforcement policies and practices.

132.   By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino NYCHA residents due to their race, ethnicity, andlor national origin-or the racial composition of their building-in violation of 42 U.S.C. §§ 1981 and 1983.

133.   The past and continuing acts and conduct of Defendants, described above, were and are intentional, and have been carried out with deliberate indifference to the federally protected rights of Mr. Elliott, his family, and his community.

134.   Defendants have intentionally, knowingly, and continuously engaged in the practices described above, with the intent of denying equal housing opportunities to the Mr. Elliott, his family, and his community.

**Eighth Claim for Relief**
**Violation of Due Process under the Fourteenth Amendment to the U.S. Constitution**

135.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

136.    Defendants' selective enforcement practices, as written and as applied, throughout the relevant period, violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by authorizing and causing NYPD officers to unlawfully stop, seize, question, frisk, search, use force, and/or arrest individuals, thus depriving Plaintiffs of their right to liberty as well as their rights to freedom of association, freedom of assembly, and intimate association, in the absence of constitutionally required procedural protections.

137.    The violation of rights alleged herein include through the initiation and pursuit of criminal charges against Mr. Elliott, members of his family, and members of his community. These charges that have directly resulted in the arrest and detention of Mr. Elliott, members of his family, and members of his community. By enforcing the law selectively and via unlawful and unconstitutional policies and practices, Defendants intentionally and under color of law have denied all Plaintiffs their right to due process of law, in violation of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**Ninth Claim for Relief**
**Violations of the New York State**
**Constitution**

138.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139.    Such conduct breached the protections guaranteed to Plaintiff by the New York State Constitution, including but not limited to, Article 1, §§ 1, 6, 11, and 12, and including the following rights:

    a.   freedom from unreasonable search and seizure of his person and property;

    b.   freedom from arrest without probable cause;

    c.   freedom from use of excessive force;

    d.   freedom from false imprisonment, that being wrongfully detained without good faith, reasonable suspicion, or legal justification, and of which wrongful detention Plaintiff was aware and did not consent;

    e.   freedom from the lodging of false charges against him by police officers, including on information and belief, by some or all of the individual Defendants;

    f.   freedom from wrongful prosecution; and

    g.   the right to equal protection under the laws.

140.    As a direct and proximate result of Defendants' deprivations of Plaintiff's rights, privileges, and immunities guaranteed by the New York State Constitution, Plaintiff suffered the injuries and damages set forth above.

141.    At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

142.    The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

**Tenth Claim for Relief**
**False Arrest and False Imprisonment**

143.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

144.    The Individual Defendants, through the foregoing acts, caused Plaintiff to be wrongfully detained and arrested without good faith, reasonable suspicion, or legal justification, and of which detention Plaintiff was aware and to which he did not consent.

145.    Individual Defendants committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiff's rights and are therefore liable for punitive damages.

146.    At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

147.    The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

**Eleventh Claim for Relief**
**Assault and Battery**

148.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

149.    The Individual Defendants, through the foregoing acts, without just cause or consent, wilfully and maliciously used harmful and/or offensive physical force against Plaintiff to arrest him and placed him in apprehension of imminent harm.

150.    Individual Defendants committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiff's rights and are therefore liable for punitive damages.

151.    At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

152.    The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

**Twelfth Claim for Relief**
**Intentional Infliction of Emotional Distress**

153.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

47

154.     The Individual Defendants, through the foregoing acts, did commit extreme and outrageous conduct and thereby intentionally, and/or recklessly caused Plaintiff to experience severe mental and emotional distress, pain, suffering, and damage to name and reputation.

155.     The Individual Defendants committed the foregoing acts intentionally, wilfully, and with malicious disregard for Plaintiff's rights and are therefore liable for punitive damages.

156.     At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

157.     The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

**Thirteenth Claim for Relief**
**Negligence**

158.     Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

159.     The Individual Defendants owed Plaintiff a duty of care, including the duty to exercise due care in the course of their duties as NYPD officers and the duty to protect citizens from the intentional misconduct of other NYPD officers.

160.     The Individual Defendants, through the foregoing acts, negligently failed to use due care in the performance of their duties in that they failed to perform their duties with the degree of care that a reasonably prudent and careful officer would have used under similar circumstances.

161.     All of these acts were performed without any negligence on the part of Plaintiff and were the proximate cause of the injuries to Mr. Elliott, his family, and his community.

162.    At all relevant times, the Individual Defendants were employees of the City and were acting within the scope of their employment.

163.    The City is therefore vicariously liable under the doctrine of *respondeat superior* for the actions of the Individual Defendants set forth herein.

### Fourteenth Claim for Relief
### Negligent Hiring, Training, and Supervision
### Under State Law

164.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

165.    The City and NYCHA are liable to Plaintiff because of its intentional, deliberately indifferent, careless, reckless, and/or negligent failure to adequately hire, train, supervise, and discipline its agents, servants, and/or employees employed and/or the NYPD with regard to aforementioned duties.

### Fifteenth Claim for Relief
### Violation of the New York State
### Human Rights Law

166.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

167.    Defendants have discriminated, and continue to discriminate, against Mr. Elliott, his family, and his community on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of the sale, rental, or lease of a housing accommodation, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

168.    Defendants have also discriminated, and continue to discriminate, against Mr. Elliott, his family, and his community on the basis of race, ethnicity, and/or national origin in the

terms, conditions, or privileges of publicly-assisted housing accommodations, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

169.    By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino residents of NYCHA Residences due to their race, ethnicity, and/or national origin-or the racial composition of their building-in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

170.    Mr. Elliott, his family, and his community have been and continue to be harmed by Defendants' violations of the New York State Human Rights Law.

**Sixteenth Claim for Relief**
**Violation of the New York City**
**Human Rights Law**

171.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

172.    Defendants have discriminated, and continue to discriminate, against Mr. Elliott, his family, and his community on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of the sale, rental, or lease of a housing accommodation, or in the furnishing of facilities or services in connection therewith, in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq.

173.    Defendants have also discriminated, and continue to discriminate, against Mr. Elliott, his family, and his community on the basis of race, ethnicity, and/or national origin in the terms, conditions, or privileges of publicly-assisted housing accommodations, or in the furnishing of facilities or services in connection therewith, in violation of the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.

174.     By the actions described above, Defendants have engaged in, and continue to engage in, a policy, pattern, and practice of discrimination against African-American and Latino residents of NYCHA Residences due to their race, ethnicity, and/or national origin – or the racial composition of their building – in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 et seq.

175.     Mr. Elliott, his family, and his community have been and continue to be harmed by Defendants' violations of the New York City Human Rights Law.

<u>**DEMAND FOR RELIEF**</u>

**WHEREFORE**, Plaintiff respectfully requests that this Court order the following relief against the Defendants, jointly and severally:

176.     Declare that Defendants' acts, practices, policies, and/or omissions have deprived Plaintiffs of their rights under the Fourth and Fourteenth Amendments to the United States Constitution; 42 U.Sc. § 1981; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. ("Fair Housing Act"); the United States Housing Act, 42 U.S.C. § 1437 et seq.; the Constitution and laws of the State of New York; and the New York City Human Rights Law;

177.     Order all appropriate injunctive relief as warranted, including, but not limited to:

(a)     enjoining Defendants immediately to cease their violation of Plaintiffs' rights, and to remedy the invidious effects of their violations in NYCHA Residences, including effectuating trespass stops and arrests in a lawful, reasonable, and nondiscriminatory manner;

(b)     enjoining Defendant City from dismissing, disregarding, or justifying misconduct, by refraining to conduct discipline, including in matters referred thereto by

CCRB for disciplinary measures, and creating and sustaining a culture of impunity for members of service enforcing policy and practice; and

(c)      enjoining Defendants to submit for the review of Plaintiff and the Court a protocol detailing lessons learned and revisions in policy and practice to substantially reduce the risk of unjustified stops, frisks, searches, detentions, and false arrests of NYCHA residents, their visitors, and other persons lawfully on the premises of NYCHA Residences in times of emergency like the COVID-19 pandemic.

178.    Award compensatory damages in an amount just and reasonable;

179.    Award punitive damages to the extent allowable by law;

180.    Order reasonable attorneys' fees and costs to be paid by Defendants pursuant to 28 U.S.C. § 2414 and 42 U.S.C. §§ 1988,3613; and;

181.    the costs and disbursements of this action;

182.    interest; and

183.    Grant such other and further relief as this Court deems just and equitable.

Dated: New York, New York
       January 13, 2023

DAYLIGHT | RULE OF LAW •
ACCESS TO JUSTICE • ADVOCACY LLC
21 Cleveland Place, Ste. 5B
New York, NY 10012
Tel. (917) 832-5937

By:  /s/ Dominique Day
        Dominique Day

*Attorney for Roland Elliott*