UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROLAND ELLIOTT, | |
| | Plaintiff, |
| -against- | |
| THE CITY OF NEW YORK, a municipal entity; NEW YORK CITY HOUSING AUTHORITY; NEW YORK CITY POLICE DEPARTMENT OFFICER LT. ERIC S. DYM, sued in his individual and official capacities; NEW YORK CITY POLICE DEPARTMENT OFFICERS JANE DOE; and JOHN DOES 1-10, all of whom are sued in their individual and their official capacities, | |
| | Defendants. |

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _03/14/2024_

23 Civ. 352 (AT) (VF)

**ORDER**

ANALISA TORRES, District Judge:

Plaintiff, Roland Elliott, brings this action against Defendants, the City of New York, the New York City Housing Authority ("NYCHA"), and New York City Police Department ("NYPD") officers Eric S. Dym, Jane Doe, and John Does 1-10, alleging that Defendants discriminatorily enforced the City's COVID-19 social-distancing policies against Black and Latinx communities. He brings claims against all Defendants for (1) violations of the Fourth, Fifth, and Fourteenth Amendments of the Constitution, under 42 U.S.C. § 1983; (2) analogous violations of the New York State Constitution; and (3) various common-law torts, including false arrest and imprisonment, assault and battery, and intentional infliction of emotional distress. Second Am. Compl. ("SAC") ¶¶ 130–57, 179–207, 215–218, ECF No. 43. In addition, he brings discrimination claims against NYCHA under (1) Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq*.; (2) the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*.; (3) the United States Housing Act, 42 U.S.C. § 1437; (4) 42 U.S.C. § 1981; (5) the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law

§ 290 *et seq.*; and (6) the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code

§ 8-101 *et seq.*  SAC ¶¶ 161–78, 210–14, 219–23.

The City and Dym (the "NYPD Defendants") move to dismiss all claims against them, except

Elliott's excessive force claim, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6).

ECF No. 57; *see* NYPD Def. Mem. at 1, ECF No. 58.  NYCHA moves to dismiss the complaint in its

entirety under Rule 12(b)(6).  ECF No. 60; *see* NYCHA Def. Mem. at 3, ECF No. 61.  For the

following reasons, the NYPD Defendants' motion is GRANTED in part and DENIED in part.

NYCHA's motion is GRANTED.

## BACKGROUND[1]

### I.   Events of April 7, 2020

On the evening of April 7, 2020, residents of the Mott Haven Houses—a NYCHA public

housing development in the Bronx—gathered at a "peaceful, outdoor vigil" to mourn the death of a

neighborhood child.  SAC ¶ 40; *see id.* ¶¶ 11, 41.  Roland Elliott, a Mott Haven resident who knew

the child well, arrived at the vigil around 8:00 p.m.  *Id.* ¶ 41.  When Elliott arrived, "two plainclothes

police were already at the scene and actively interfering with the vigil, including attempting to

disperse" the gathering.  *Id.* ¶ 42.  Elliott told the officers that the children in attendance were

mourning their friend.  *Id.*  In response, the officers "cursed at him, including using obscene

language, demanded he remove his hands from his pockets, and verbally harassed him."  *Id.*

Elliott decided to leave the vigil.  *Id.* ¶ 43.  As he was leaving, the officers approached him

and "began punching, hitting, and tackling him to the ground."  *Id.*  "Additional officers arrived and

joined the attack," using a taser to bring Elliott to the ground.  *Id.*  The officers continued tasing,

punching, and kicking Elliott while he was on the ground.  *Id.*  The complaint identifies the officers

---

[1] The following facts are taken from the complaint, which the Court accepts as true for purpose of this motion. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

involved in "initiating and perpetuating the stop, harassment, initiation and persistence of the use of force" as Officer Eric S. Dym, a female officer and several other unknown officers (the "Individual Defendants"). *Id.* ¶¶ 14, 44–45.

The officers handcuffed Elliott and took him to the police station ("PSA7"), the taser prongs still in his legs. *Id.* ¶ 46. After some time, an officer "tore the taser prongs" from Elliott's legs, searched him, and shackled him at the ankles. *Id.* Officers took Elliott to the hospital after approximately an hour, where he was handcuffed to a door by NYPD personnel and received medical attention. *Id.* ¶¶ 46, 48. Officers then brought Elliott back to PSA7 and, later, to be arraigned in Bronx County Criminal Court. *Id.* ¶ 49. He was released at around 4:00 p.m. on April 8, 2020. *Id.* ¶ 50. When he returned home, Elliott learned that his son's mother was also chased by police the previous night, and that officers had told her that "they would put [Elliott's] son 'in the ground.'" *Id.* Elliott's son was also arrested that night. *Id.*

The events left Elliott with "lacerations, bruising, swelling, and injuries to his face and head," as well as "serious emotional distress, anxiety, and fear." *Id.* ¶¶ 47, 50. He "avoided leaving his apartment for weeks" and, when he did, "often observed officers following and observing him in unmarked vehicles." *Id.* ¶ 51. The case against him was ultimately dismissed. *Id.* ¶ 49.

## II.   City Policies and Practices

Elliott alleges that he "was one of many Mott Haven Houses residents and people in the vicinity of the Mott Haven Houses harassed, illegally stopped and searched, and experiencing the unlawful use of force" during the COVID-19 pandemic, from March 2020 to October 2022. *Id.* ¶¶ 5, 52. He claims that his unlawful treatment by the NYPD on April 7, 2020, resulted from the City and NYCHA's "use of NYPD to enforce COVID-19 social distancing policy."[2] *Id.* ¶ 57. According to

---

[2] Elliott alleges that the NYPD and NYCHA "cooperate" pursuant to several memoranda of understanding, which (among other things) require NYCHA to "curat[e] NYPD's activities, tactics, and procedures specific to public housing areas." *Id.* ¶ 20.

Elliott, "the City selectively enforced COVID-19 restrictions, often with a particular punitive, carceral, and force-ridden approach for Black and Brown New Yorkers and in Black communities in the City." *Id.* ¶ 59.  He claims that "NYCHA has allowed NYPD to operate with impunity and deliberate indifference toward the rights of public housing residents, their guests, and others in the vicinity." *Id.* ¶ 24.  At the same time, Elliott alleges, "NYPD enforcement of social distancing against white persons and communities was gentle or nonexistent." *Id.* ¶ 81.  Elliott alleges that Defendants' actions amount to "a *de facto* policy, practice, and/or unofficial custom of selective enforcement, harassment, surveillance, violence, and arrests" in the relevant period.  *Id.* ¶ 4.

Elliott further alleges that Dym "and his colleagues at PSA7 were an ongoing driver of police misconduct and brutality in the Mott Haven neighborhood." *Id.* ¶ 115.  He claims that Dym and his colleagues "were frequently in the vicinity and the source of the harassment, unlawful stops and searches, and abuses of authority." *Id.* ¶ 119.[3]  And, he argues, the City knew or should have known of Dym's abuses of authority, but failed to take steps to "disclose or eradicate [his] misconduct." *Id.* ¶ 115.

Elliott served a notice of claim on the City on October 6, 2020.  *Id.* ¶¶ 127–28.  He filed this action on January 14, 2023, and amended his complaint on February 22 and May 22, 2023.  ECF Nos. 1, 24, 43.

## DISCUSSION

I.   Rule 12(b)(1)

A.  Legal Standard

An action should be dismissed pursuant to Rule 12(b)(1) where it is apparent that the court lacks subject matter jurisdiction—that is, the statutory or constitutional power—to adjudicate it.  *See*

---

[3] Dym was subject to twenty-eight CCRB complaints, resulting in fifty-six substantiated allegations of misconduct, and at least fourteen lawsuits alleging misconduct.  *Id.* ¶ 100; *see also* NYPD Def. Mem. at 20 (acknowledging that Dym "undoubtedly has a long disciplinary history").

Fed. R. Civ. P. 12(b)(1); *Thomas v. Metro. Corr. Ctr.*, No. 09 Civ. 1769, 2010 WL 2507041, at *1 (S.D.N.Y. June 21, 2010).  Challenges to a plaintiff's standing are addressed under Rule 12(b)(1). *See Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  A district court must consider a challenge to subject matter jurisdiction before addressing other grounds for dismissal.  *Rhulen Agency, Inc. v. Ala. Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).  On a Rule 12(b)(1) motion, the Court must accept all material factual allegations as true.  *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004).  It may not, however, "draw inferences . . . favorable to [the] plaintiff[]" on such a motion.  *Id.*  And, the Court may consider evidence outside the pleadings to resolve disputed factual issues relating to jurisdiction.  *See id.*

B.  Injunctive Relief

The NYPD Defendants argue that Elliott lacks standing to sue for injunctive relief.  When seeking injunctive relief against a municipality, a plaintiff has standing only if he can "carry the burden of establishing that 'he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'"  *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–102 (1983)).  This requires a plaintiff to show "both a likelihood of future harm and the existence of an official policy or its equivalent." *Id.* at 216 (emphasis omitted) (citing *Lyons*, 461 U.S. at 105–06).  Defendants contend that Elliott can show neither.  NYPD Def. Mem. at 8–9.

As discussed further below, the Court finds that Elliott has adequately alleged the second prong of the *Shain* test, the existence of an official policy or its equivalent.  *See An v. City of New York*, 230 F. Supp. 3d 224, 229 n.1 (S.D.N.Y. 2017) (collecting cases that hold that a showing of official policy for the purposes of municipal liability is sufficient for *Shain* and *Lyons*).  His ability to

5

pursue equitable relief, therefore, turns on whether he has alleged a likelihood of future harm—that is, whether he has alleged that he is "realistically threatened by a repetition of his experience . . . or whether the claim is speculative." *Curtis v. City of New Haven*, 726 F.2d 65, 67 (2d Cir. 1984) (citation and quotation marks omitted).

In *Medina v. City of New York*, for example, NYPD officers allegedly placed a plaintiff in a chokehold, repeatedly tased him, and pulled his pants down to search him—all because he was listening to loud music at a car dealership in Washington Heights.  No. 19 Civ. 412, 2020 WL 7028688, at *1–3 (S.D.N.Y. Nov. 30, 2020).  The plaintiff brought a § 1983 lawsuit seeking injunctive relief against the City, alleging deliberate indifference in failing to "train, supervise, investigate, and discipline its officers to prevent the kinds of constitutional violations" he experienced.  *Id.* at *4.  He argued that a "a real and immediate threat of future injury exist[ed] because, among other things, 'he continues to engage in the lawful conduct that brought him in contact with the NYPD—listening to music and barbequing with friends outdoors.'"  *Id.* at *5.  But the district court found these allegations "too speculative and conjectural" to confer standing.  *Id.* The court also rejected the plaintiff's argument that his "subjective fear" of the police after the incident established standing: under *Lyons*, the court held, the plaintiff needed to point to "objective criteria indicating that the recurrence of the unlawful conduct is relatively likely to occur."  *Id.* at *6.

The complaint here similarly falls short of fulfilling *Shain*'s first prong.  Elliott does not allege that he will likely be stopped, searched, or harassed by the police in the future for purportedly violating the City's COVID-19 social distancing policies (or for any other reason).  Indeed, the complaint confines its allegations of misconduct to the "relevant period," which it defines as the period "from March 1, 2020 – October 30, 2022."  SAC ¶ 5; *cf. Liberian Comm. Ass'n*, 970 F.3d at 184–85 (holding that plaintiffs failed to plead a likely risk of future quarantining where the Ebola quarantine policy at issue had since been revised).  Elliott also alleges that the "climate of fear"

6

created by Defendants' misconduct "impacted his everyday actions, including his willingness and capacity to be out in public." *Id.* ¶ 113.  But, this "subjective fear" does not establish that "the recurrence of the unlawful conduct is relatively likely to occur." *Medina*, 2020 WL 7028688, at *6.

Elliott also argues that the City's continuing failure to discipline officers who have engaged in misconduct, and its decision to reconstitute the NYPD's "Anti-Crime Unit" establish a "likelihood of future harm." Pl. Opp. at 29, ECF No. 64.  Although these allegations may support an inference that incidents of misconduct will continue to occur throughout the city, they do not bear on the relevant inquiry—whether Elliott has alleged a "likelihood that *he* will again be wronged in a similar way." *Shain*, 356 F.3d at 216 (emphasis added) (quoting *Lyons*, 461 U.S. at 111).

Accordingly, the NYPD Defendants' motion to dismiss Elliott's claims for injunctive relief is GRANTED.

II.   Rule 12(b)(6)

A.  Legal Standard

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth. *Id*.  On a motion to dismiss, the Court must draw all reasonable inferences in the non-movant's favor. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

B.  Statute of Limitations

The NYPD Defendants argue that all of Elliott's state common-law and constitutional claims are time-barred by New York General Municipal Law § 50-i.[4]  NYPD Def. Mem. at 4–6.  That section provides that "any action against a municipality for injury to person or property by reason of the negligence or wrongful act of any of its officers, agents or employees must be commenced within one year and ninety days of the event complained of."  *Taylor v. Mayone*, 626 F.2d 247, 252 (2d Cir. 1980).  "New York courts have held that the one-year-and-ninety-day statute of limitations applies to claims not only against municipalities themselves, but also against 'any officer, agent, or employee thereof,' if the municipality is required to indemnify the defendant."  *Conte v. Cnty. of Nassau*, 596 F. App'x 1, 5 (2d Cir. 2014) (quoting N.Y. Gen. Mun. L. § 50-i) (citation omitted).

On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic.  9 N.Y.C.R.R. § 8.202.8.  Subsequent orders extended the tolling period until November 3, 2020.  Exec. Order 202.72 (Nov. 3, 2020).

Elliott does not dispute that his state-law claims accrued at the latest on April 8, 2020, when he was released from police custody.  Nor does he dispute that—including the COVID-19 tolling period—he did not file his complaint within the one-year-and-ninety-day statute of limitations governing his state-law claims.  He argues, however, that he has alleged "continuing violations," including "a *de facto* discriminatory policy, and the deliberate indifference of all Defendants, throughout the relevant period."  Pl. Opp. at 22–23.

The "continuing violation" exception to the standard accrual date of a claim arises when "there is evidence of an ongoing . . . policy or practice."  *Van Zant v. KLM Royal Dutch Airlines*, 80

---

[4] "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint."  *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015) (citation omitted).

F.3d 708, 713 (2d Cir. 1996).  "[T]he existence of such a continuing . . . practice or policy may delay the commencement of the statute of limitations period 'until the last [] act in furtherance of it.'" *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999) (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992)).  To survive a motion to dismiss based on a statute of limitations, "the claimant must allege both the existence of an ongoing policy . . . and some non-time-barred acts taken in furtherance of that policy." *Id.* at 250.

"New York's continuing tort doctrine does not extend the limitations period for [all] continuing pattern[s] of tortious conduct, but rather is limited to certain recognized torts that involve continuing harm." *Lucas v. Novogratz*, No. 01 Civ. 5445, 2002 WL 31844913, at *7 (S.D.N.Y. Dec. 18, 2002).  The Court's first task, therefore, is to determine which of the challenged claims could involve "continuing harm," as opposed to "discrete torts." *Id.*

Elliott's claim for false arrest and imprisonment cannot be salvaged under the continuing violation doctrine.  *See* SAC ¶¶ 187–91.  "While false arrest and imprisonment *are* recognized as continuing torts, their continuity is restricted to the period of actual restraint"—for Elliott, the day he was released from custody.[5]  *Lucas*, 2002 WL 31844913, at *7.  His claim for assault and battery is also time-barred, as "[c]auses of action for assault and battery accrue immediately upon the occurrence of the tortious act and thus, are not appropriate for the continuing violation exception." *Canosa v. Ziff*, No. 18 Civ. 4115, 2019 WL 498865, at *8 (S.D.N.Y. Jan. 28, 2019) (citation omitted); *see* SAC ¶¶ 192–96.  Similarly, Elliott's claims for intentional infliction of emotional distress ("IIED"), negligence, and abuse of process—which are premised on the actions of the Individual

---

[5] In dismissing the false arrest claim as time-barred, the Court does not reach the NYPD's argument that the officers are entitled to qualified immunity.  NYPD Def. Mem. at 10–12.

Defendants—arise from the April 7, 2020 incident, making them unfit for the exception.[6]  *See* SAC ¶¶ 197–207, 215–218.  And, although Elliott suggests that these claims should be subject to equitable tolling, *see* Pl. Opp. at 23–25, the Court cannot find that Defendants "conceal[ed]" their alleged misconduct that day such that Elliott was unable "to discover the facts underlying his cause of action."  *Cerbone v. Int'l Ladies Garment Workers' Union*, 768 F.2d 45, 48 (2d Cir. 1985).

Elliott's ninth claim alleges various violations of his rights under the New York Constitution. SAC ¶¶ 182–86.  Most of these violations relate specifically to the events of April 9, 2020, alleging that Defendants breached Elliott's right to be free from (1) unreasonable search and seizure, (2) arrest without probable cause, (3) excessive force, (4) false imprisonment, (5) the lodging of false charges, and (6) wrongful prosecution.  *Id.* ¶ 183.  The Court finds that these acts, "if wrongful, constituted discrete torts," requiring Elliott to file the action within the limitations period.  *Lucas*, 2002 WL 31844913, at *7.  Elliott also alleges, however, that Defendants denied him "the right to equal protection under the laws."  SAC ¶ 183(g).  The Second Circuit has applied the continuing violation doctrine to equal protection claims where a plaintiff alleges "an ongoing policy of discrimination" and "some non-time-barred acts taken in furtherance of that policy."  *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 309 (2d Cir. 2020) (quotation marks and citation omitted).  This claim—which is not specifically tied to the events of April 7—may, therefore, qualify for the exception.

In his tenth claim, for "negligent hiring, training, and supervision," Elliott alleges that the City is liable because of its "failure to adequately hire, train, supervise, and discipline its agents, servants, and/or employees employed and/or the NYPD."  SAC ¶ 209.  Read in the light most favorable to

---

[6] Elliott argues that these torts constitute continuing violations because, after the April 7 incident, he continued to witness arbitrary stops, arrests, and harassment of Mott Haven residents.  Pl. Opp. at 23.  Even assuming that Elliott would have standing to bring claims based on these incidents, however, the incidents are "separate and distinct acts that imposed separate harms . . . [e]ven if they were committed pursuant to a common scheme [or] plan."  *Lucas*, 2002 WL 31844913, at *7.  "Commission of a second tort . . . later does not extend the statute of limitations period for an earlier tortious act."  *Id.*

10

Plaintiff, this claim is not tethered to Elliott's mistreatment on April 7, but alleges continuing harm resulting from the City's negligent employment practices.

The Court's next task is to determine whether the complaint alleges a "continuing pattern and practice of actionable behavior" with respect to Elliott's claims for equal protection under the state constitution and negligent hiring, training, and supervision. *Lucas*, 2002 WL 31844913, at *7. The Court finds that it does not. On the negligent hiring, training, and supervision claim, Elliott alleges "a widespread failure on the part of NYPD supervisors to detect and take corrective action regarding unconstitutional stops-and-frisks conducted by subordinate officers." SAC ¶ 36. On the equal protection claim, he alleges that the City had a "de facto custom, policy and practice of widespread selective enforcement of the law in Black and Latine communities in New York City, and particularly in the PSA 7 service range . . . throughout the relevant period." *Id.* ¶ 98. These statements and others in the complaint "can be construed to allege that [the City] has [] continuous polic[ies] and practice[s]" of (1) negligent supervision of NYPD officers, and (2) selective, race-based enforcement of the COVID-19 social distancing laws. *Harris*, 186 F.3d at 250. But, Elliott has not alleged any discriminatory act against him, resulting from these policies and practices, "that did occur within the statute of limitations, so that his claim would not be time-barred." *Id.*

The NYPD Defendants' motion to dismiss Elliott's state common-law and constitutional claims as time-barred is, therefore, GRANTED to all Defendants as to claims nine, ten, eleven, twelve, thirteen, fourteen, and sixteen.

### C. Personal Involvement by Dym

The NYPD Defendants contend that Elliott "fails to allege how [Dym] is personally involved" in the events alleged, requiring his dismissal as a defendant. NYPD Def. Mem. at 17–20. "To establish a Section 1983 violation, a plaintiff must plead (and later prove) that each defendant was personally involved in the alleged constitutional violation." *Wiggins v. Griffin*, 86 F.4th 987, 996 (2d

11

Cir. 2023).  A defendant cannot be held vicariously liable under § 1983 for employing or supervising

an employee that violated the plaintiff's rights; rather, a plaintiff must plead "that each Government-

official defendant, through the official's own individual actions, has violated the Constitution."

*Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

The complaint alleges that Dym was "initiating and perpetuating the stop, harassment,

initiation and persistence of the use of force."  SAC ¶ 44.  It further alleges that Dym was "frequently

in the area" of Mott Haven, "approaching and harassing people without cause or suspicion, and

violence and other abuses of authority would regularly ensue."  *Id.* ¶ 121.  And, it states that Elliott

frequently observed Dym (and the other Individual Defendants) "come into the community, round

everyone up who was standing in groups outside in the courtyards and outside areas, arrest and

transport them to PSA7."  *Id.* ¶ 122.

Drawing all inferences in Elliott's favor, the complaint plausibly alleges Dym's personal

involvement in the events of April 7, 2020.  Although the complaint does not set forth Dym's specific

actions on that day, "such specificity . . . is not required where, as here, the complaint gives each

defendant fair notice of what the plaintiff's claim is and the ground upon which it rests."  *Buari v.

City of New York*, 530 F. Supp. 3d 356, 390 (S.D.N.Y. 2021) (cleaned up); *see also Paul v. City of

New York*, No. 16 Civ. 1952, 2017 WL 4271648, at *4 (S.D.N.Y. Sept. 25, 2017) (denying motion to

dismiss where, although the complaint did not "consistently specify exactly which officer did what,"

the allegations "impl[ied] that all of the Individual Defendants . . . were at least present at the scene

and witnessed the events").

The NYPD Defendants' motion to dismiss the claims against Dym is, therefore, DENIED.

D.  Equal Protection

1.  NYPD Defendants

The NYPD Defendants next argue that Elliott has failed to state a claim for violations of the Equal Protection Clause of the Fourteenth Amendment because he does "not alleg[e] that he was selectively treated differently than those similarly situated."  NYPD Def. Mem. at 14.

As the Second Circuit has explained, there are "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause."  *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).  Plaintiffs can assert that "they were treated differently than an identifiable, similarly situated group of individuals for malicious reasons, including but not limited to racial prejudice"—called a "selective enforcement" or *LeClair* claim.  *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006) (citing *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980)).  A plaintiff can also assert a "class of one" claim: that they "were intentionally treated differently from others similarly situated and that there was no rational basis for this difference in treatment."  *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  To allege either a *LeClair* or *Olech* claim, a plaintiff must identify a "comparator who received more favorable treatment from the defendants."  *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019).  An *Olech* claim "requires an extremely high degree of similarity between a plaintiff and comparator," while a *LeClair* claim requires a "reasonably close resemblance."  *Id.* at 93 (quotation marks omitted).  Given this inquiry's "fact-intensive nature," the Circuit has "cautioned against deciding whether two comparators are similarly situated on a motion to dismiss."  *Id.* at 97.

The complaint identifies two groups of white New Yorkers that Elliott alleges were treated differently than the Mott Haven community: (1) Hasidic Jews gathered for a funeral in Williamsburg who were dispersed by NYPD "without force, violence, citations, or arrests," and (2) "predominantly white neighborhoods, like Park Slope, Brooklyn" that "experienced no social distancing arrests."

SAC ¶¶ 82, 84.  The Court finds that the first group passes the *LeClair* "reasonably close resemblance" bar, if barely.  Elliott alleges "differential treatment by the same defendant [(the City)] for the same conduct" (gathering for a memorial during social distancing).  *Hu*, 927 F.3d at 97; *see* SAC ¶ 41 (alleging that Elliott was in the vicinity for a vigil).  However, the complaint does not allege an "extremely high degree of similarity between" the groups gathered in Mott Haven and Williamsburg, as required to state an *Olech* claim.  Nor do Elliott's statistics about lax enforcement in predominantly white neighborhoods allege a comparator with the requisite specificity for either type of claim.  *See Hu*, 927 F.3d at 101 ("[S]tatistics cannot substitute for specific comparators in *Olech* or *LeClair* claims.")

There is also a third type of equal protection claim—a *Pyke* claim—that does not require a plaintiff to "show a better treated, similarly situated group of individuals of a different race."  *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001).  These claims involve a plaintiff who "alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner." *Id.*  In these cases, a similarly-situated-group requirement is unnecessary "because the Government's differential treatment of the target group [can] otherwise be clearly demonstrated" using, for example, "statistical evidence." *Doe*, 462 F. Supp. 2d at 545–46.  "The *Pyke* analysis implicitly recognizes that a government that sets out to discriminate intentionally in its enforcement of some neutral law or policy will rarely if ever fail to achieve its purpose." *Id.* at 546.

The NYPD Defendants contend that Elliott has failed to "identify[] a law or policy that has been applied in an intentionally discriminatory manner."  NYPD Def. Mem. at 15.  The Court disagrees.  The complaint adequately alleges a violation of equal protection under *Pyke*; namely, that the NYPD Defendants enforced the City's facially neutral social-distancing policies in an "intentionally discriminatory and race-based manner" against "African-American and Latine communities." SAC ¶ 138; *see, e.g.*, *id.* ¶¶ 53–61, 139.  Elliott supports these allegations with studies

14

finding that, for example, New York "ZIP codes with higher percentages of lower income and Black residents experienced disproportionately high rates of policing during the COVID-19 pandemic in the name of public health." *Id.* ¶ 55; *see also id.* ¶ 87 (news article stating that "81 percent of social distancing arrests have been minorities"). Elliott "will, of course, be required to substantiate [his] claim" that the NYPD Defendants were at least in part "motivated by racial discrimination." *Pyke*, 258 F.3d at 110. At this early stage, however, the NYPD Defendants' motion to dismiss the equal-protection claims is DENIED, except to the extent that Elliott seeks to rely on a "class-of-one" *Olech* theory.

### 2.   NYCHA

NYCHA separately moves to dismiss Elliott's federal equal protection claim, arguing that he "fails to plead NYCHA intentionally discriminated against him." NYCHA Def. Mem. at 12. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

The Court agrees that Elliott has not adequately pleaded NYCHA's involvement in the NYPD's allegedly unconstitutional practices. Elliott identifies several ways that NYCHA and the NYPD have "cooperat[ed]," including: (1) in 1995, NYCHA shifted responsibility for policing public housing from its own police force to the NYPD; (2) NYCHA was "directly responsible for curating NYPD's activities, tactics, and procedures specific to public housing areas"; (3) NYPD must "identify and share with NYCHA enumerated categories of arrests of NYCHA residents"; and (4) NYCHA "invokes the assistance of NYPD in enforcing its House Rules," which require residents and guests to answer questions from NYPD officers. SAC ¶¶ 18–24. Elliott does not explain, however, how these instances of collaboration specifically implicate NYCHA in the events of April 7, which involved NYPD officers carrying out NYPD policies and practices. At bottom, Elliott alleges,

"NYCHA failed to cure or meaningfully deter the conduct that led to the violations of [his] rights." *Id.* ¶ 24.  But, without allegations as to why NYCHA is responsible for the actions of the officers in this case, Elliott's claim against NYCHA only sounds in vicarious liability.  *See Smith v. Doe*, No. 10 Civ. 3136, 2010 WL 3733103, at *2 (S.D.N.Y. Sept. 7, 2010) ("The Housing Authority is not liable for the actions of NYPD officers.").  Accordingly, NYCHA's motion to dismiss Elliott's second cause of action is GRANTED.

E.   Due Process

The NYPD Defendants also move to dismiss Elliott's claim for violations of due process under the Fourteenth Amendment, which they interpret as a malicious prosecution claim.  NYPD Def. Mem. at 12; SAC ¶¶ 179–81.  Elliott does not respond to this argument in his brief, effectively abandoning the claim.  *See Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) ("[A] court may . . . infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned" (cleaned up) (citation omitted)).  In any case, to the extent Elliott seeks to bring a substantive due process claim, the claim is not viable.  "Where another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process."  *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) (quoting *Kia P. v. McIntyre*, 235 F.3d 749, 757–58 (2d Cir. 2000)).  Here, because all of Elliott's constitutional claims are "covered" under the Fourth or Fifth Amendment or the Equal Protection Clause, the Court finds that he does not have an additional substantive due process cause of action under the Fourteenth Amendment.  *Holland v. City of New York*, 197 F. Supp. 3d 529, 548 (S.D.N.Y. 2016); *see also Velez*, 401 F.3d at 94 (holding that plaintiff's substantive due process claim was either "subsumed in her more particularized [First Amendment and Equal Protection Clause] allegations, or must fail").  The NYPD Defendants' motion to dismiss the standalone due process claim is, therefore, GRANTED as to all Defendants.

F.  Municipal Liability

1.  NYPD Defendants

The NYPD Defendants argue that Elliott has failed to allege facts sufficient to state a cause of action against the City under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).  NYPD Def. Mem. at 20–25.  A *Monell* claim has five elements: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008).  "The fifth element has two separate requirements: a plaintiff must plausibly allege both the existence of a municipal policy and that the policy caused (i.e., was the 'moving force' behind) plaintiff's injury." *Medina*, 2020 WL 7028688, at *6 (quoting *Roe*, 542 F.3d at 37).  The "official policy" requirement "may be met by 'a practice so persistent and widespread, or permanent and well settled, as to constitute a custom or usage with the force of law and to imply the constructive knowledge of policymaking officials,' or by 'a failure to train or supervise subordinates amounting to deliberate indifference to the rights of those with whom the municipality's employees come into contact.'" *Id.* (cleaned up) (quoting *Felix v. City of New York*, 344 F. Supp. 3d 644, 653 (S.D.N.Y. 2018)).

The complaint relies on both theories.  First, Elliott alleges that the NYPD's practice of "target[ing] Black and Latine persons" in its enforcement of social-distancing restrictions was "so widespread as to have the force of law."  SAC at 23 & ¶¶ 62–78.  Elliott cites various sources supporting his claim, including a May 2020 Legal Aid Society report finding that most "COVID-19 related arrests and summonses were in neighborhoods that are majority Black and Latine," despite more complaints to New York's 311 hotline coming from predominantly white neighborhoods, and NYPD data showing that "68% of those arrested for social distancing violations in New York City between March 16 and May 5 were Black and 24% were Hispanic."  *Id.* ¶¶ 62, 69; *see also id.* ¶ 96

(then-NYPD commissioner, discussing summonses and arrests "tied to COVID": "Are they mostly to minority members of this city? Yes, they are."). Elliott also illustrates his claims with contemporaneous news articles and social media posts depicting violent stops, arrests, and detentions for alleged social-distancing violations. *Id.* ¶¶ 70–78. The NYPD Defendants contend that these sources are "inadmissible hearsay." NYPD Def. Mem. at 23. But, "although this objection may prevail on summary judgment, it does not on this Rule 12 motion." *An v. City of New York*, No. 16 Civ. 5381, 2017 WL 2376576, at *4 (S.D.N.Y. June 1, 2017); *see also Medina*, 2020 WL 7028688, at *7 (considering plaintiff's citations to "specific news reports and other investigations" in denying motion to dismiss *Monell* claim). Taken together and viewed in the light most favorable to Elliott, these allegations of drastic, widely reported racial disparities in COVID-19 policing support a "a plausible inference that municipal liability may exist here, at least at the motion to dismiss stage."[7] *Medina*, 2020 WL 7028688, at *7.

Elliott also alleges that the City has failed to "train or supervise" the NYPD officers tasked with enforcing social-distancing restrictions "in a way that amounts to deliberate indifference." *Id.* To prove deliberate indifference, a plaintiff must show "(1) that a policymaker knows to a moral certainty that her employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by

---

[7] The NYPD Defendants also argue that Elliott "only alleges details of his own incident, which is insufficient to claim a widespread policy that *Monell* requires." NYPD Def. Mem. at 22. They cite *White v. City of New York*, 206 F. Supp. 3d 920 (S.D.N.Y. 2016), in which the plaintiff alleged that "[h]alf a dozen dissimilar events spread over the past five years" constituted a "policy of abuse towards transgender persons." *Id.* at 938. Elliott's complaint is more robust: he alleges that he experienced and witnessed the discriminatory enforcement of Covid-19 social distancing rules in a particular community (Mott Haven) over a specific period (the pandemic). *See also Murphy v. City of New York*, 23 Civ. 1925 (S.D.N.Y.) (alleging that two other Mott Haven residents experienced similar incidents around the same time). At this stage, "[t]he Court does not and need not take any position on the admissibility or ultimate sufficiency of [P]laintiff's possible evidence." *Adkins v. City of New York*, 143 F. Supp. 3d 134, 142 (S.D.N.Y. 2015). "It asks only whether plaintiff has 'nudged [his] claims across the line from conceivable to plausible,'" and finds that he has done so. *Id.* (quoting *Twombly*, 550 U.S. at 570)).

the employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (cleaned up).

Elliott's allegations support a plausible inference that these elements are met.  First, Elliott adequately alleges that the City knew "to a moral certainty" that NYPD officers tasked with enforcing social distancing "would confront situations that may lead to the use of force, including excessive force," racial profiling, and other potential constitutional violations.  *Medina*, 2020 WL 7028688, at *7; *see* SAC ¶¶ 54–57.  Elliott also alleges facts suggesting that "significant racial disparities and racial profiling persists in [police] enforcement in Black and Latine communities, particularly in public housing in New York City."  SAC ¶¶ 21, 34–38 (citing *Floyd v. City of New York*, 959 F. Supp. 2d 540 (S.D.N.Y. 2013), and *Davis v. City of New York*, No. 10 Civ. 0699 (S.D.N.Y.)).  Dym's substantial disciplinary record—and the City's alleged tolerance of police misconduct—further support the deliberate indifference claim.  SAC ¶¶ 105–17.

The NYPD Defendants' motion to dismiss Elliott's *Monell* claims is, therefore, DENIED.

### 2.  NYCHA

NYCHA also moves to dismiss Elliott's *Monell* claims, arguing that Elliott has not alleged that the April 7, 2020 incident can be attributed to any NYCHA policy, practice, or custom.  NYCHA Def. Mem. at 10–12.  As with Elliott's equal protection claim against NYCHA, the *Monell* claims fail because Elliott does not allege facts sufficient to infer that the NYPD officers were acting pursuant to NYCHA policy, nor that NYCHA was responsible for training and supervising NYPD officers.  *See supra* Part II.D.2.  As Elliott argues in his response brief, "NYPD is a single entity, with centralized leadership, that polices all of New York City" pursuant to "[c]itywide rules and regulations."  Pl. Opp. at 10.  Elliott does not allege that NYCHA is involved in NYPD policymaking or discipline; at most, he contends that NYCHA should have acted to stop police misconduct within its facilities.  Absent nonspeculative allegations that NYCHA holds policymaking authority in this area, however,

Elliott fails to state a *Monell* claim. *See Wood v. Town of E. Hampton*, No. 08 Civ. 4197, 2010 WL 3924847, at *25 (E.D.N.Y. Sept. 30, 2010) (plaintiff's "mere assertions that the individual Village Defendants are 'policymakers' is not sufficient for liability to attach to the Village under *Monell*.").

NYCHA's motion to dismiss Elliott's *Monell* claims is, therefore, GRANTED.

### G. Claims against NYCHA

#### 1. 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964

Elliott also brings several claims alleging that NYCHA's discriminatory actions have diminished his ability to enjoy the benefits of his residence. In his fourth cause of action, Elliott alleges that he is "unable to use and enjoy his home, residence, and community because [NYCHA's] selective enforcement of the law [is] conducted in such a consistently unlawful and discriminatory manner that the residents are not free to come and go as they wish." SAC ¶ 159. He contends that NYCHA's conduct violates Title VI of the Civil Rights Act of 1964, which states that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

In his seventh cause of action, moreover, Elliott alleges that NYCHA has denied him and his community "the enjoyment of the benefits, privileges, terms, and conditions of their contractual relationship with NYCHA, because they are limited in their ability to enter and exit their own homes, to live freely in their communities, and to receive guests," in violation of 42 U.S.C. § 1981. SAC ¶ 174. Section 1981 "protects the right of all persons to make and enforce contracts free from discrimination on the basis of race." *Davis v. City of New York*, 902 F. Supp. 2d 405, 433 (S.D.N.Y. 2012) (quotation marks and citation omitted).

NYCHA first argues that Elliott lacks standing to sue under these statutes because he does not allege that he is a tenant or authorized occupant of a NYCHA apartment. NYCHA Def. Mem. at 23–

24, 25–26.  NYCHA submits the declaration of Benjamin Mitchell, a NYCHA assistant manager, who states a "thorough search" of NYCHA's tenant databases did not find a record of Elliott as a leaseholder or authorized occupant during the relevant period.  ECF No. 63.  The Court need not resolve the issue because NYCHA challenges Elliott's statutory standing, not his Article III standing. "Unlike Article III standing, which ordinarily should be determined before reaching the merits, . . . statutory standing may be assumed for the purposes of deciding whether the plaintiff otherwise has a viable cause of action."  *Coan v. Kaufman*, 457 F.3d 250, 256 (2d Cir. 2006).  The Court, therefore, assumes for the purposes of this motion that Elliott has standing to bring Title VI and § 1981 claims.

For similar reasons as his equal protection claim against NYCHA, however, Elliott fails to state a claim under either Title VI or § 1981.  *See supra* Part II.D.2; Pl. Opp. at 20 (noting that "the discriminatory misconduct and failures of equal protection underlying Mr. Elliott's § 1983 claim . . . indicate NYCHA's conduct violates Title VI [] and § 1981").  "In order to establish a claim based on either statute, the plaintiff must show, *inter alia,* that the defendant discriminated against him on the basis of race, that that discrimination was intentional, and that the discrimination was a 'substantial' or 'motivating factor' for the defendant's actions."  *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (quotation marks and citations omitted).  Here, Elliott has not alleged facts sufficient to infer that the actions of the NYPD and its officers should be attributed to NYCHA.[8] These claims cannot satisfy the first requirement.  NYCHA's motion to dismiss these claims is, therefore, GRANTED.

### 2.  Fair Housing Act

In his fifth cause of action, Elliott alleges that NYCHA violated the Fair Housing Act by discriminating on the basis of race "in the terms, conditions, or privileges of the provision of services

---

[8] For this reason, *Davis*—which involved trespass policies and practices "approved and adopted" by NYCHA—is inapposite.  *See* Am. Compl. at 42, No. 10 Civ. 699 (S.D.N.Y.), ECF No. 69.

or facilities in connection with the sale or rental of a dwelling" and "in the exercise or enjoyment of a dwelling." SAC ¶ 162 (citing 42 U.S.C. §§ 3604(b), 3617). Elliott does not dispute that the Fair Housing Act requires a plaintiff to commence a civil action "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice," 42 U.S.C. § 3613(a)(1)(A), nor does he dispute that he did not file his lawsuit within two years of the April 7, 2020 incident. Instead, Elliot argues that he has alleged "the discriminatory practices of [NYCHA] involved known, ongoing, and continuing violations." Pl. Opp. at 18.

"[I]n the housing context, courts have applied the continuing-violation theory where the type of violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period." *Jordan v. Chase Manhattan Bank*, 91 F. Supp. 3d 491, 503 (S.D.N.Y. 2015) (quotation marks and citation omitted). As described above, "some of [Elliott's] claims concern unlawful 'practices,' which can occur over a period of time, thereby constituting a 'continuing violation.'" *Clement v. United Homes, LLC*, 914 F. Supp. 2d 362, 373 (E.D.N.Y. 2012); *see supra* Part II.B. However, Elliott does not adequately allege that NYCHA—as opposed to the NYPD—maintained a discriminatory practice, much less one that extended into the limitations period. *See supra* Part II.D.2. The continuing violation doctrine, therefore, does not render his claims timely. NYCHA's motion to dismiss Elliott's Fair Housing Act claim is, therefore, GRANTED.

### 3.   United States Housing Act

In his sixth cause of action, Elliott argues that NYCHA has violated the United States Housing Act, 42 U.S.C. § 1437, "by failing to provide reasonable accommodation [to] Mr. Elliott, his family, and his community." SAC ¶ 168. In his response brief, Elliott clarifies that this claim seeks to "enforce § 1437d(*l*)," Pl. Opp. at 18–19, which, among other things, requires public housing

agencies to "utilize leases . . . which do not contain unreasonable terms or conditions."  42 U.S.C.

§ 1437d(*l*)(2).  Elliott contends that NYCHA's "permissiveness to a de facto policy of

unconstitutional targeting . . . is not a reasonable condition."  Pl. Opp. at 20.  However, Elliott does

not allege that submission to the NYPD's allegedly unlawful practices is a condition of his NYCHA

lease.  *Compare* SAC ¶¶ 167–72 *with Davis*, 902 F. Supp. 2d at 442 ("This lawsuit alleges that

NYCHA has included in its lease addendum unreasonable terms and conditions.").  NYCHA's

motion to dismiss Elliot's United States Housing Act claim is, therefore, GRANTED.

4.  NYSHRL and NYCHRL

Finally, in his fifteenth and seventeenth causes of action, Elliott alleges that NYCHA violated

the NYSHRL and NYCHRL by discriminating against him on the basis of race.  SAC ¶¶ 210–14,

219–23.  NYCHA first argues that the claims must be dismissed because Elliott failed to comply with

the statutory notice-of-claim requirement for a state claim against NYCHA before commencing this

action."  NYCHA Def. Mem. at 29 (citing N.Y. Pub. Hous. Law § 157(1); N.Y. Gen. Mun. Law § 50-

e(2)).  NYCHA is incorrect: "[A] notice of claim is not required to assert a claim for civil rights

violations" under the NYSHRL or NYCHRL.  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*,

815 F. Supp. 2d 679, 709 (S.D.N.Y. 2011) (quoting *Swinton v. City of New York*, 877 N.Y.S.2d 68,

70 (2009).  The Court declines to dismiss Elliott's claims on this basis.

However, Elliott's allegations do not make out a prima facie case of discrimination under

either the NYCHRL or NYSHRL.  "[D]iscriminatory motive is critical to state a claim under the

NYCHRL."[9]  *Tchatat v. City of New York*, No. 14 Civ. 2385, 2015 WL 5091197, at \*16 (S.D.N.Y.

Aug. 28, 2015).  As discussed above regarding Elliott's equal protection and *Monell* claims against

NYCHA, Elliott has not alleged any differential treatment attributable to a discriminatory motive on

---

[9] The NYCHRL is construed "independently from and more liberally than its federal and state counterparts.  *Campbell v. Cellco P'ship*, 860 F. Supp. 2d 284, 295 (S.D.N.Y. 2012) (cleaned up).  "Because of this, if plaintiff's claims fail under the NYCHRL they necessarily fail under the NYSHRL."  *Id.* at 295 n.123.

NYCHA's part.  *See supra* Parts II.D.2, F.2.  Elliott has, therefore, failed to allege a prima facie case of discrimination, as required to state a claim under the NYCHRL or NYSHRL.  NYCHA's motion to dismiss his fifteenth and seventeenth causes of action is GRANTED.

## CONCLUSION

For the reasons set forth above, NYCHA's motion is GRANTED in full.  The NYPD Defendants' motion to dismiss is GRANTED as to Elliott's (1) claims for injunctive relief; (2) claims for violations of the New York State Constitution, (3) due process claim; and (4) state-law claims for false arrest and false imprisonment, assault and battery, IIED, negligence, abuse of process, and negligent hiring, training, and supervision.  The motion is DENIED as to all other claims.  Accordingly, Elliott may proceed on claims one, two, and three against the NYPD Defendants.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 57 and 60.

SO ORDERED.

Dated: March 14, 2024
      New York, New York

_____
ANALISA TORRES
United States District Judge

24